**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff–Appellee,

v.

THOMAS FRANCIS HALE,

      Defendant–Appellant.

No. 13-4099

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:06-CR-00871-DN-BCW-1)**

Joseph Alexander Little, IV, Bone McAllester Norton, PLLC, Nashville, Tennessee, for the Defendant–Appellant.

Stewart Michael Young, Assistant United States Attorney (David B. Barlow, United States Attorney, with him on the briefs), Office of the United States Attorney, District of Utah, Salt Lake City, Utah, for the Plaintiff–Appellee.

Before **LUCERO**, **HARTZ**, and **HOLMES**, Circuit Judges.

**LUCERO**, Circuit Judge.

Thomas Francis Hale filed for bankruptcy in 2005. During the course of that bankruptcy, he allegedly lied under oath and attempted to conceal from the bankruptcy trustee an agreement to sell property. After his relationship with the trustee became antagonistic, Hale sent her a package with unidentified material and a note that said, "Possible Haz-mat? Termites or Hanta virus [sic] from mice?" In 2013, Hale was convicted of making a materially false statement under oath in a bankruptcy case, concealing a contract from the bankruptcy trustee and creditors, and perpetrating a hoax regarding the transmission of a biological agent. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm in part and reverse in part.

**I**

In October 2005, Hale filed a voluntary Chapter 13 bankruptcy petition, which "authorizes an individual with regular income to obtain a discharge after the successful completion of a payment plan approved by the bankruptcy court." Marrama v. Citizens Bank of Mass., 549 U.S. 365, 367 (2007). In Schedule A to Hale's Statement of Financial Affairs, signed under penalty of perjury and filed with the bankruptcy court, Hale listed three pieces of real property. He stated that a parcel in Salt Lake City, Utah (the "SLC Property") had a market value of $190,000 and was subject to a secured claim of $198,000. Hale also listed two properties in Pocatello, Idaho, and indicated that both properties were subject to secured claims in excess of their market values. Hale's Schedule A thus reflected that there was no equity in his real property. Although tax

-2-

valuations on the SLC Property ranged from $189,800 to $198,300 between 2001 and 2004, the 2005 assessment—released several months before Hale filed for bankruptcy—indicated that the property was worth $268,900. Hale challenged the 2005 assessment, and although his challenge ultimately failed, it was pending at the time the Schedule A was filed.

Hale moved to convert his bankruptcy case from Chapter 13 to Chapter 7 on July 13, 2006, and an order was subsequently entered to that effect. "Chapter 7 authorizes a discharge of prepetition debts following the liquidation of the debtor's assets by a bankruptcy trustee, who then distributes the proceeds to creditors." Marrama, 549 U.S. at 367. Although "under Chapter 13 the debtor retains possession of his property," pursuant to "Chapter 7 the debtor's nonexempt assets are controlled by" a trustee. Id. Elizabeth Loveridge, a panel Chapter 7 trustee for the state of Utah, became trustee of Hale's bankruptcy estate.

Loveridge questioned Hale at his first meeting of creditors on August 22, 2006. The meeting was recorded and Hale was placed under oath. The following interaction took place between Loveridge and Hale:

Loveridge:  And did you sign the petitions, schedules, statements, related bankruptcy documents you filed with the court?

Hale:  Yes, ma'am.

Loveridge:  Did you read these documents before you signed them?

Hale:  Yes, ma'am.

| | |
|---|---|
| Loveridge: | Do you have personal knowledge of the information contained in your bankruptcy documents? |
| Hale: | Yes, ma'am. |
| Loveridge: | To your best knowledge and belief, is the information contained in your petition schedules, statements and related bankruptcy documents true, complete and accurate? |
| Hale: | Yes, ma'am. |
| Loveridge: | Are you aware of any changes or amendments that need to be made? |
| Hale: | No, ma'am. |

Although Loveridge believed, at the time of the meeting, that the value listed for the SLC Property on Hale's Schedule A was less than its actual market value in August 2006, and although she asked specific questions regarding the SLC Property, she did not inquire specifically about the value that Hale listed on Schedule A.

Hale did not divulge that he had placed an ad regarding the SLC Property in the Salt Lake Tribune and the Deseret Morning News. The ad, which was published on the day of the meeting, listed the SLC Property for "$396,075 or appraisal." A real-estate agent cold-called Hale after seeing the advertisement, and eventually located an interested purchaser, Kenny Riches. Hale never informed the agent that there was an impediment to a sale or that he was involved in a bankruptcy case. On September 1, 2006, Hale and Riches entered a "Real Estate Purchase Contract," agreeing on a sale of the SLC Property for $395,000. In an addendum to the contract, Hale committed to contribute half of the buyer's closing costs, up to $6,000. Additionally, both Hale and

Riches signed a handwritten document on September 1, 2006, granting Hale the right to rent a portion of the rear home on the SLC Property for $300 per month for up to ten years. Hale did not inform Riches about the bankruptcy proceeding.

On September 21, 2006, an employee of Landmark Title called Loveridge and informed her that a closing had been scheduled on the SLC Property. Loveridge requested copies of the documents and directed the title company to cancel the sale. Later that day, Hale made two unannounced visits to Loveridge's office, appearing "agitated and angry." During the first visit, Hale told Loveridge that the title company was supposed to inform her of the sale earlier but had erred. A representative of the title company, however, later testified that Hale never indicated to her that he was involved in a bankruptcy case.

During his second visit that day, Hale gave Loveridge several documents. These included two motions to the bankruptcy court: an ex parte motion to approve the sale of the SLC Property and a motion to re-convert the case to Chapter 13. In the ex parte motion, Hale said that, in his experience as an attorney who had practiced bankruptcy law for more than twenty years, "it is rare that a debtor's property will ever bring full market value on a forced sale by a Trustee" and that, although he "requested in writing that the Trustee expedite the sale process," she had not done so. A letter from Hale attached to the ex parte motion and dated September 11, 2006, requested that Loveridge contact the title company and bemoaned her alleged lack of a fax machine and "reluctance to answer [Hale's] calls." Loveridge testified that she had a functioning fax machine at the time

and that Hale had not called her. Moreover, an affidavit, dated September 11, 2006, from the individual who managed Hale's office stated that the letter attached to the ex parte motion was mailed on September 11. But the affidavit refers to the ex parte motion, which was not filed until September 21, 2006, and would not have been created had Loveridge received and agreed with the letter.

A real estate agent, on behalf of Loveridge, contacted Riches to renegotiate the sale of the SLC Property. Within one week, Loveridge and Riches executed a new contract, again for $395,000. Unlike the first contract, the subsequent agreement did not make the seller responsible for any portion of the closing costs, and the home was sold "as is," with "no warranties expressed or implied." Additionally, under the second contract, Hale did not retain the right to rent a portion of one of the homes on the SLC Property; to the contrary, the contract required the eviction of the current tenants. After the trustee moved for approval of the sale, Hale faxed a hand-written message to Landmark Title promising a "<u>full</u> round of litigation <u>at the very least</u>." On October 17, 2006, the bankruptcy judge signed an order granting approval of the trustee's sale of the property to Riches.

Six days after the order was signed granting approval for the sale, Hale filed an emergency motion to dismiss his bankruptcy case. He subsequently received a notice to quit the SLC Property from Loveridge's attorney, dated October 31, 2006. The bankruptcy court denied Hale's emergency motion to dismiss on November 13, 2006. The next day, Loveridge's attorney sent Hale a letter stating that eviction proceedings

pertaining to the SLC Property had been initiated. The letter reflected a perceived lack of cooperation from Hale, noting that Hale had cancelled insurance and water service for both Pocatello properties.

During this timeframe, Loveridge received several faxes from Hale regarding insurance, electricity, and snow removal on the Idaho properties, among other matters. The record reflects that Loveridge received six different handwritten faxes from Hale on November 16, 2006, alone. Those notes concerned potential code violations at one of the Pocatello properties, tax arrearages and payments of mortgages, the functioning of fire extinguishers, and the winterizing of outdoor spigots. One fax simply said "Please check out the possible haz-mat problem sent in an orange envelope today."

Loveridge received an orange envelope, listing the SLC Property as a return address, on November 20, 2006. Hand-written on the envelope was: "Caution! Hand-cancel please!" Loveridge immediately called the police. The Salt Lake City police and fire departments, U.S. Postal inspectors, members of the joint terrorism task force, and FBI agents responded. After x-raying the envelope to ensure that there were no explosives inside and testing it for radiation and volatile organic compounds, the envelope was opened by a member of the bomb squad. Inside was a sandwich baggy with an unidentified material, and a note that said, "Possible Haz-mat? Termites or Hanta virus [sic] from mice?" Hantavirus, trial testimony reflects, is a Class Three agent in the four-level classification of "bioterrorism type" agents, and carries a fatality rate of roughly fifty percent. The contents of the orange envelope were taken to the Utah State

Lab for testing, which revealed "no evidence of hantavirus present" in the material.

Evidence presented at trial indicated that Hale did not believe the envelope contained

hantavirus. Hale told a friend that "[i]t was just the way that . . . you do business"

because the trustee was "playing hardball with him."

After a jury trial, Hale was convicted of making a materially false statement under

oath in a bankruptcy case, concealing the purchase contract from the trustee and

creditors, and perpetrating a hoax regarding the transmission of a biological agent. He

was sentenced to 27 months' imprisonment.

## II

Hale challenges his conviction under 18 U.S.C. § 152(2) for "knowingly and

fraudulently mak[ing] a false oath or account in or in relation to any" bankruptcy case.

The superseding indictment alleged that Hale falsely testified under oath at the meeting

of creditors with his responses to the following two questions:

> Question: To your best knowledge and belief, is the information
> contained in your petition, statements, schedules and related
> bankruptcy documents true, complete and accurate?
>
> Answer: Yes, Mam [sic].
>
> Question: Are you aware of any changes or amendments that need to be
> made?
>
> Answer: No, Mam [sic].

According to the superseding indictment, Hale made these "declarations knowing full

well" that the SLC Property "had a value in excess of $190,000." Hale contends that the

questions were "fundamentally ambiguous" and cannot support the conviction.

## A

As a preliminary matter, the parties dispute the appropriate standard of review. In a pro se motion filed in the district court, Hale argued that the above-quoted questioning was fundamentally ambiguous, but the district court dismissed the pro se motion without prejudice because Hale was represented by counsel. Permission to engage in hybrid representation, under which the defendant is represented by counsel but is permitted to proceed partially pro se, is within the discretion of district courts. United States v. Treff, 924 F.2d 975, 979 n.6 (10th Cir. 1991); United States v. Lucas, 619 F.2d 870, 871 (10th Cir. 1980) ("[T]he trial court's determination on that issue will not be overturned absent an abuse of discretion."). Hale has not suggested that the district court abused its discretion by refusing to allow hybrid representation. And as the government points out, Hale could have re-filed his pro se motion through his counsel but did not do so. We agree with the government that the issue was not properly presented to the district court.

"If an error is not properly preserved, appellate-court authority to remedy the error (by reversing the judgment, for example, or ordering a new trial) is strictly circumscribed." Puckett v. United States, 556 U.S. 129, 134 (2009). Under these circumstances, plain error review applies. "We find plain error only when there is (1) error, (2) that is plain, (3) which affects substantial rights, and (4) which seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Romero, 491 F.3d 1173, 1178 (10th Cir. 2007).

**B**

Even under the plain error standard, Hale argues that his § 152 conviction cannot stand. "Precise questioning is imperative as a predicate for the offense of perjury." Bronston v. United States, 409 U.S. 352, 362 (1973). "'Courts have required near-absolute clarity from the questioner in order to support a perjury charge.'" United States v. Strohm, 671 F.3d 1173, 1178 (10th Cir. 2011) (quoting Linda F. Harrison, The Law of Lying: The Difficulty of Pursuing Perjury Under the Federal Perjury Statutes, 35 U. Tol. L. Rev. 397, 403 (2003)). Nonetheless, "[f]undamental ambiguity is the exception, not the rule." United States v. Farmer, 137 F.3d 1265, 1269 (10th Cir. 1998). "Where a question admits of two reasonable interpretations, some evidence must show what the question meant to the defendant when []he answered it. Otherwise, the Government has not provided the jury with enough evidence to conclude beyond a reasonable doubt that the defendant knowingly rendered false testimony . . . ." Id. (citations omitted).

As it was in Strohm, "our consideration of a question's fundamental ambiguity in Farmer is a useful analogue." 671 F.3d at 1180. In Farmer, we primarily considered the following exchange:

> Q. Have you talked to Mr. McMahon, the Defendant about your testimony here today?
>
> A. No.

137 F.3d at 1267. We concluded that "[w]hether the phrase 'here today' refers to the word 'talked' or the word 'testimony,' is patently unclear," and that "[o]nly by surmise

-10-

and conjecture could the jury conclude that Defendant understood the question as the prosecutor did." Id. at 1270.

The questioning at issue in this case shares some of Farmer's ambiguity. It is unclear whether the trustee's questions referred to the truth, completeness, and accuracy of Hale's documents at the time that they were executed or at the time that the questioning occurred. At oral argument, the government said that it interpreted the questions to ask whether the documents were correct at the time that they were filed. Yet in the government's appellate brief, it seems to selectively rely on the two alternatives to rebut Hale's arguments. The government states that it "argued the case" on the theory that the question referred to Hale's understanding at "the time he listed his assets," yet also argues that Hale's answers were unambiguously false because Hale was informed several months after filing Schedule A that the SLC Property was worth substantially more than the value he had assigned it. Moreover, in closing arguments below, the prosecutor stated that Hale dishonestly answered the questions "because he knew, as of August 22, 2006, his property had increased in value because what do we know about Mr. Hale and what he did? He placed an ad in the newspaper on August 22, 2006 . . . ." The prosecutor also referred to the defense's "theory of the case" as arguing Hale understood the questions as referring to the accuracy of the schedules when they were originally created. In light of the government's representations, we conclude there was error.

We also hold that the error was plain. "[A]n error is 'plain' if it is clear or obvious

-11-

at the time of the appeal." United States v. Gonzalez-Huerta, 403 F.3d 727, 732 (10th Cir. 2005) (en banc). As we indicated in United States v. Cordery, 656 F.3d 1103 (10th Cir. 2011), "plain" signifies "clear under current law," generally requiring that "the Supreme Court or this court has addressed the issue." Id. at 1106 (quotations and alterations omitted). As noted above, the temporal ambiguity in this case mirrors that in Farmer. Moreover, although the ambiguity was not properly raised in the district court, the parties extensively debated the appropriate temporal application of the question in the district court. The government's contradictory briefing and arguments highlight the point.

To satisfy the third prong of plain-error review, Hale must demonstrate "that there is a reasonable probability that, but for the error claimed, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." United States v. Rosales-Miranda, No. 13-1150, 2014 WL 3033419, at *4 (10th Cir. July 7, 2014) (publication in F.3d forthcoming) (citation and quotations omitted). The government concedes that the jury instructions did not cabin the jury's consideration to one of the temporal interpretations of the contracts. In Farmer, we concluded that reversal was required because the jury could decide how the defendant understood the question only "by surmise and conjecture." 137 F.3d at 1270. In the present matter, there similarly was nothing to anchor the jury to a specific understanding of the question and the government did not offer any evidence regarding how Hale understood it. Thus, pursuant to Farmer, we are satisfied that the error affected

-12-

Hale's substantial rights.[1]

Hale must also demonstrate that the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." Romero, 491 F.3d at 1178. The fourth prong of the plain error test is a fact-specific inquiry. See Rosales-Miranda, 2014 WL 3033419, at *8 (quotations omitted). We will exercise our discretion to reverse "only where the error is particularly egregious and the failure to notice the error would result in a miscarriage of justice." Id. (quotations omitted). "In an instance of non-constitutional error the standard for satisfying the fourth prong of the plain error test is demanding." United States v. Dazey, 403 F.3d 1147, 1178 (10th Cir. 2005).

We acknowledge that "[t]he principal purpose of the Bankruptcy Code is to grant a fresh start to the honest but unfortunate debtor." Marrama, 549 U.S. at 367 (quotations omitted). Our sibling circuits have similarly recognized that "[t]he success of our bankruptcy laws requires a debtor's full and honest disclosure." Burnes v. Pemco Aeroplex, Inc., 291 F.3d 1282, 1288 (11th Cir. 2002); accord Payne v. Wood, 775 F.2d 202, 205 (7th Cir. 1985) ("The operation of the bankruptcy system depends on honest reporting."); In re Mascolo, 505 F.2d 274, 278 (1st Cir. 1974) ("The successful

---

[1] The indictment also alleges that Hale falsely answered the question of whether he knew of "any changes or amendments that need to be made" to the schedules. But the government concedes that it never argued that Hale had a duty to amend the schedules to reflect post-filing changes in value. And trial testimony suggested that the question regarding amendments would have been understood as asking whether any amendments needed to be made so that the schedule would have been correct on the date it was filed. Accordingly, the second question suffers from the same ambiguity as the first and does not provide an independent basis to affirm the § 152 conviction.

-13-

functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure."). We agree with the government that there are reasons to believe that Hale was less than forthcoming.

Nonetheless, although the government cites significant evidence suggesting Hale knew the SLC Property was worth substantially more than $190,000 at some point, very little of that evidence pertains to the period up to and including Hale's initial filing of Schedule A in October 2005. The government demonstrated that the 2005 assessed value on the SLC Property was $268,900, and that the assessment would have been received months before Hale filed the Schedule A. Hale, however, appealed that assessment, and his appeal was not dismissed until several months after the Schedule A was filed. The $190,000 figure reported by Hale was close to the last, unchallenged assessment of the property. Moreover, the trustee testified that a debtor can be in the best position to know the value of his property. Other testimony indicated that the reported value should reflect what the debtor "believes the value of the property to be" and that the debtor is not required to undertake expenses to arrive at an estimate. Although the record suggests that Hale was aware that the SLC Property had a significantly higher value as early as November 2005, there is a reasonable probability that the jury would not have convicted Hale if it had been clear that the questions referred to the accuracy of Schedule A at the time it was filed. That conclusion alone, however, "does not necessarily compel reversal." United States v. Hill, 749 F.3d 1250, 1267 (10th Cir. 2014).

"[T]he nature of the error at issue in this case," id., convinces us that relief is

-14-

appropriate. As noted, the government represented that its interpretation of the questions at issue related to Hale's knowledge in October 2005. Yet instead of charging Hale with "making a false declaration, certificate, verification, or statement under penalty of perjury" with regard to his representations in Schedule A itself, § 152(3), Hale was charged with falsely answering a temporally ambiguous question that inquired about numerous filings and was asked nearly a year after the documents were submitted. We do not think it proper to condone the prosecution's creation of this ambiguity. We thus conclude that the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." Romero, 491 F.3d at 1178. We reverse the conviction under § 152, and remand for entry of a judgment of acquittal on the false statement count.

### III

Hale urges us to reverse his conviction for concealing the purchase agreement because the agreement was void or, alternatively, does not meet the statutory definition of "property belonging to the estate of a debtor," § 152(1), and thus the evidence was insufficient to support his conviction. We review a sufficiency of the evidence challenge de novo, "viewing the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the government. We will reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Grassie, 237 F.3d 1199, 1207 (10th Cir. 2001) (quotation omitted).

Section 152(1) prohibits a debtor from "knowingly and fraudulently conceal[ing] . . ., in connection with a case under title 11, from creditors or the United

-15-

States Trustee, any property belonging to the estate of a debtor." Id. The parties agree that the dispositive question with respect to this issue is whether the real estate purchase contract at issue falls within the definitions of property contained in 11 U.S.C. § 541(a)(6) or (7). Those subsections define property of the estate to include: "[p]roceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case," § 541(a)(6), and "[a]ny interest in property that the estate acquires after the commencement of the case," § 541(a)(7). "For purposes of most bankruptcy proceedings, property interests are created and defined by state law. Once that state law determination is made, however, we must still look to federal bankruptcy law to resolve the extent to which that interest is property of the estate under § 541." Parks v. Dittmar (In re Dittmar), 618 F.3d 1199, 1204 (10th Cir. 2010) (quotation omitted).

Arguing that the contract was void ab initio, Hale contends it did not constitute property at all because it did not create any enforceable rights. "It is black-letter law that a void contract 'is not a contract at all' and 'is void of legal effect,'" Borde v. Bd. of Cnty. Comm'rs, 514 F. App'x 795, 806 (10th Cir. 2013) (unpublished) (quoting Restatement (Second) of Contracts § 7 cmt. a (1981)). If the contract was merely voidable, however, the trustee possessed a "legal power, either of avoidance or of ratification, or of both," 1-1 Corbin on Contracts § 1.6 (2014); see also Restatement (Second) of Contracts § 7. We agree with the government that the contract was voidable

-16-

rather than void.

A bankruptcy trustee "<u>may</u> avoid a transfer of property of the estate . . . that occurs after the commencement of the case; and . . . that is not authorized under this title or by the court." 11 U.S.C. § 549(a) (emphasis added); <u>see also</u> <u>Jubber v. Bank of Utah (In re C.W. Mining Co.)</u>, 749 F.3d 895, 898 (10th Cir. 2014) ("A trustee may avoid a post-petition transfer of estate property that was not authorized by the Bankruptcy Code or the court."). We have previously sanctioned the application of § 549 to an alleged debtor-initiated, post-petition transfer of property. <u>See</u> <u>Hill v. Kinzler (In re Foster)</u>, 275 F.3d 924, 926-28 (10th Cir. 2001). Other circuits have done the same. <u>See, e.g.</u>, <u>Marathon Petroleum Co. v. Cohen (In re Delco Oil, Inc.)</u>, 599 F.3d 1255, 1258-60 (11th Cir. 2010) (concluding trustee could avoid unauthorized debtor-initiated transactions); <u>Peoples Bank & Trust Co. v. Burns</u>, 95 F. App'x 801, 806 (6th Cir. 2004) (per curiam) (unpublished) ("Insofar as the subject transactions included an unauthorized post-petition transfer of property from [the debtor to another], the bankruptcy court correctly concluded that the transfer was voidable—not 'void,' but 'voidable.'"); <u>40235 Washington St. Corp. v. Lusardi</u>, 329 F.3d 1076, 1081 (9th Cir. 2003) ("The purpose of section 549 . . . is to provide a just resolution when the debtor himself initiates an unauthorized postpetition transfer. The general rule in such situations is that the trustee is authorized to avoid the transfer in order to protect the creditors.").

At oral argument, Hale admitted both the SLC Property and any funds realized from its sale would constitute property of the estate, but he argued that the contract itself

did not. Under Utah law, however, Hale obtained an interest in the $395,000 promised in exchange for the SLC Property once the contract was executed. Cf. Pioneer Builders Co. of Nev., Inc. v. K D A Corp., 292 P.3d 672, 692 & n.85 (Utah 2012) (recognizing that "a party who purchases property under an executory real estate contract obtains a recognizable interest in the property before the contract is paid in full"); Cannefax v. Clement, 818 P.2d 546, 548, 549 (Utah 1991) (stating that the vendor in a land sale contract's "true interest is in receiving the unpaid amount on the contract"). And because the trustee could have elected to ratify the purchase agreement, it necessarily created a right in the estate to those same funds, contingent upon ratification. Hale notes that the trustee did not ultimately ratify the agreement, but the estate nevertheless had an interest in the proceeds of the sale under the purchase agreement. Moreover, "an interest may be property of the estate even if it is novel or contingent." In re Dittmar, 618 F.3d at 1207 (quotation omitted).

Because we conclude that the purchase agreement created an interest in "proceeds . . . from property of the estate," § 541(a)(6), we affirm Hale's conviction on the concealment count.

**IV**

Finally, Hale challenges his conviction for perpetrating a hoax involving biological weapons. Hale was convicted under a statute that criminalizes "engag[ing] in any conduct with intent to convey false or misleading information under circumstances where such information may reasonably be believed and where such information

-18-

indicates that an activity has taken, is taking, or will take place that would constitute a violation of" 18 U.S.C. § 175. § 1038(a). Section 175 prohibits "knowingly . . . transfer[ring] . . . any biological agent, toxin, or delivery system for use as a weapon"— that is, "for other than prophylactic, protective, bona fide research, or other peaceful purposes." "Biological agent" is defined to include

> any microorganism (including, but not limited to, bacteria, viruses, fungi, rickettsiae or protozoa), or infectious substance, or any naturally occurring, bioengineered or synthesized component of any such microorganism or infectious substance, capable of causing—
>
> (A) death, disease, or other biological malfunction in a human, an animal, a plant, or another living organism;
>
> (B) deterioration of food, water, equipment, supplies, or material of any kind; or
>
> (C) deleterious alteration of the environment.

§ 178(1).

## A

Conceding that plain error review is appropriate, Hale argues that § 175, the predicate statute underlying his hoax conviction, is unconstitutional. Hale further conceded in his briefing that at the time of trial, the alleged error was not plain. He anticipated, however, that the Supreme Court's decision in Bond v. United States, 134 S. Ct. 2077 (2014), would render the error plain by holding unconstitutional an analogous statute, 18 U.S.C. § 229. The Supreme Court declined to reach the constitutional issue in Bond. See 134 S. Ct. at 2087. We will discuss the impact of the Supreme Court's

-19-

reasoning in <u>Bond</u> in greater detail <u>infra</u>. But Hale's concessions, coupled with the Court's decision to avoid the constitutional issue in <u>Bond</u>, doom his argument that Congress lacked authority to pass § 175.

**B**

Additionally, Hale attacks the sufficiency of the evidence for his hoax conviction, contending that the government failed to prove that his actions were not for "peaceful purposes" within the meaning of § 175(c). In <u>Bond</u>, the Supreme Court addressed the conviction of a woman for violating a section of the Chemical Weapons Convention Implementation Act of 1998, which makes it a crime knowingly to "possess[] or use . . . any chemical weapon" and contains a similar "peaceful purpose" exception. 134 S. Ct. at 2085 (quoting 18 U.S.C. §§ 229(a)(1) & 229F(7)). The defendant in that case had applied "easy to see" chemicals to different objects belonging to a romantic rival in the hope that the rival would "develop an uncomfortable rash." <u>Id.</u> The Supreme Court reversed her convictions, reading the statute narrowly in an effort to avoid "dramatically intrud[ing] upon traditional state criminal jurisdiction." <u>Id.</u> at 2088. It considered the "ordinary meaning" of the defined term "chemical weapon," <u>id.</u> at 2091, explaining that "[t]he substances that Bond used bear little resemblance to the deadly toxins that are of particular danger to the objectives of the Convention," <u>id.</u> at 2090 (quotation omitted). And the Court expressed concern that the government's broader interpretation "would transform the statute from one whose core concerns are acts of war, assassination, and terrorism into a massive federal anti-poisoning regime that reaches the simplest of

-20-

assaults."  Id. at 2091-92.

Hale argues that his conviction is comparable to that of the petitioner in Bond. Just as "no speaker in natural parlance would describe Bond's feud-driven act of spreading irritating chemicals on [her rival's] door knob and mailbox as 'combat,'" id. at 2090, Hale contends that his actions are similarly far removed from the type of conduct targeted by § 175.  We must disagree.  Hale did not spread "irritating chemicals" on a door knob.  Rather, he mailed a substance purporting to contain a virus that, according to expert testimony at trial, causes a "very severe disease" and is fatal in approximately half of all cases.  Inhalation of hantavirus causes the lungs to fill with fluid, leading to severe acute respiratory distress syndrome.  The virus is not directly treatable, and thus individuals who are exposed are typically only given supportive care.  Although testimony reflected that hantavirus has not been used for terrorist activity in this country, an epidemiologist testified that the virus potentially could be used for such activities, and that it is considered a Class Three agent in the four-level classification of "bioterrorism type" agents.

In retaliation against an official's discharge of her duties as an officer of the court, Hale claimed to send a deadly virus through the mail.  See Satterfield v. Malloy, 700 F.3d 1231, 1234 (10th Cir. 2012) (noting that bankruptcy trustees act as "officer[s] of the court" when discharging their official duties (quotation omitted)).  Unlike the plot at issue in Bond, such conduct is "in natural parlance" referred to as "terrorism."  Bond, 134 S. Ct. at 2090, 2092; see, e.g., United States v. Keyser, 704 F.3d 631, 635 (9th Cir. 2012)

-21-

(sending packets of sugar labeled "Anthrax" was "feign[ing] multiple acts of biological terrorism"); United States v. Chapple, 251 F. App'x 553, 559 (10th Cir. 2007) (unpublished) (referring to such mailings as "terror-related threats"). In his supplemental brief, Hale underplays the gravity of his charge, discussing the ramifications of sending "a baggie of mouse droppings" in the mail. However, taking the evidence in the light most favorable to the government, as we must, Grassie, 237 F.3d at 1207, Hale perpetrated a hoax that, had it involved the virus it was purported to involve, would have been covered by § 175 even in light of the Supreme Court's guidance in Bond. See 134 S. Ct. at 2092 ("The Federal Government undoubtedly has a substantial interest in enforcing criminal laws against assassination, terrorism, and acts with the potential to cause mass suffering.").

## C

Alternatively, Hale contends that he did not convey "false or misleading information" under § 1038(a) because he actually "committed a violation of" § 175. That is, Hale argues that the definition of "biological agent" in § 178(1) is sufficiently broad to encompass the material that he sent to Loveridge. Our review is for plain error because the issue was not raised below.

Even assuming, arguendo, that there was error, it was not plain. We are not directed to any cases demonstrating that an actual violation of § 175 with one form of biological agent precludes conviction under § 1038 for falsely claiming to transmit another agent. See Cordery, 656 F.3d at 1106 (to establish plain error, appellant

-22-

generally must show that "the Supreme Court or this court has addressed the issue"). Moreover, given the Supreme Court's holding in <u>Bond</u>, it is far from clear that the material, which Hale describes as mouse droppings and termites, could support a conviction under § 175. <u>C.f.</u> <u>Bond</u>, 134 S.Ct. at 2090-91. Thus, Hale cannot show plain error.

Essentially rehashing his previous contention, and conceding our review is for plain error, Hale claims that had the jury been instructed on the statutory definition of "biological agent," it would have concluded that his actions did not fall within the hoax statute because the material he sent was actually a biological agent. Hale's argument misses the mark. Hale was charged with falsely claiming that he sent the trustee a material that might contain hantavirus. The indictment did not charge that he sent something—anything—that met the statutory definition of "biological agent." Accordingly, a jury instruction on the definition of "biological agent" would not have affected the verdict regardless of whether the substance in the envelope actually qualified as a biological agent. Because the instruction did not affect Hale's substantial rights, he has failed to demonstrate plain error.

**V**

We **AFFIRM** in part, **REVERSE** in part, and **REMAND** for proceedings consistent with this opinion. Hale's renewed motion for release pending appeal is **DENIED** as moot.

-23-