**UNITED STATES COURT OF APPEALS**

**March 7, 2017**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

        Plaintiff - Appellant,

v.

NATHAN WHITNEY DRAGE,

        Defendant - Appellee.

No. 15-4190
(D.C. No. 2:09-CR-00460-DS-BCW-4)
D. Utah

**ORDER AND JUDGMENT**[*]

Before **BRISCOE**, **EBEL**, and **MURPHY**, Circuit Judges.

## I. Introduction

A jury found defendant-appellee, Nathan Drage, guilty of three counts of willful failure to file corporate tax returns and one count of conspiracy to impair and impede the Internal Revenue Service. The district court acquitted Drage of the conspiracy conviction, concluding the government's evidence was not sufficient to show Drage had an unlawful agreement with any coconspirator. The

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

district court also conditionally granted Drage's motion for a new trial as to the conspiracy count. *See* Fed. R. Crim. P. 29(d). The government appeals.

Exercising jurisdiction pursuant to 18 U.S.C. § 3731, this court **reverses** the district court's rulings and **remands** the matter to the district court to reinstate the guilty verdict.

## II. Background

Drage and three other individuals—Lester H. Mower, Eva Jeanette Mower,[1] and Adrian A. Wilson—were charged in a superseding indictment with, *inter alia*, conspiracy to impede "the lawful government functions of the Internal Revenue Service in the ascertainment, computation, assessment, and collection of . . . federal income taxes." *See* 18 U.S.C. § 371. The alleged objective of the conspiracy was the concealment of income from the IRS. The charges arose from a reverse merger[2] business in which Drage, Lester Mower, and Wilson were engaged for many years. Drage was also charged with multiple counts of willful failure to file corporate income tax returns. *See* 26 U.S.C. § 7203.

---

[1]According to Drage, the charges against Ms. Mower were dismissed pursuant to Fed. R. Crim. P. 48(a).

[2]"A reverse merger is a transaction in which a privately-held corporation acquires a publicly-traded corporation [the "shell company"], thereby allowing the private corporation to transform into a publicly-traded corporation without the necessity of making an initial stock offering." *SEC v. M & A West, Inc.*, 538 F.3d 1043, 1046 (9th Cir. 2008).

The prosecution against Drage proceeded to trial in February 2015. The government's theory as to the conspiracy charge was that Drage conspired with Mower and Wilson to impede the IRS by concealing information necessary for the IRS to properly assess income taxes against him. The government argued the deception "occurred at every phase of [the reverse merger] business" and the concealed information included the ownership and taxable sales of stock.

The government's evidence demonstrated the scheme worked as follows. Drage, Mower, and Wilson obtained a controlling interest in a publically traded company "with minimal assets and liabilities and no actual operations," i.e., a "shell company." *SEC v. M & A West, Inc.*, 538 F.3d 1043, 1046 (9th Cir. 2008). They then installed nominees to serve as officers and directors of the shell company. These nominees had no function other than to sign documents on behalf of the shell companies; all decisions with respect to the shell companies were actually made by Drage, Mower, and Wilson. Drage's role included preparing documents necessary to transfer stock in the shell companies to individual nominees and entities controlled by him, Mower, and Wilson. A privately held company was then merged into the shell company and the nominees became stockholders in the post-merger company.

The government's evidence showed that once the reverse mergers were complete, Drage prepared the legal documents necessary for the nominees to transfer shares in the post-merger corporation to him, Mower, and Wilson or to

entities controlled by them. One witness, who served as an officer and director of a post-merger corporation known as NetAmerica International Corporation ("NetAmerica"), gave an example of how these transfers were effectuated. He testified that Drage prepared documents directing the issuance of shares in NetAmerica intended for a nominee[3] to instead be issued to "Nathan Drage" and "Nathan W. Drage, trustee." Drage also prepared documents necessary for shares in NetAmerica to be transferred to a company controlled by Wilson known as A-Vision Financial Corp. A unanimous consent prepared by Drage stated that A-Vision Financial was being reimbursed for post-merger legal expenses it allegedly financed. The witness, however, testified that Drage provided all the legal services for the NetAmerica reverse merger. In other post-merger documents prepared by Drage, additional shares of stock in NetAmerica were issued to A-Vision Financial and A-Business Funding Corp., an entity controlled by Mower, allegedly as repayment for bridge loans. The witness testified that the decision as to how many new shares should be registered or the individuals or entities to whom shares in NetAmerica would be issued was made by Drage or Wilson.

---

[3]Pursuant to a document Drage prepared and filed with the SEC, the shares were initially issued to a nominee named Michael Labertew. Labertew testified he never received the stock because Mower and Wilson, instead, paid him $1000 cash as compensation for his role as nominee. He endorsed a blank irrevocable stock power based on representations made to him by Mower and Wilson that the shares would be returned to NetAmerica.

Once stock in the post-merger company was issued, the shell game began.[4] First, shares in the post-merger companies held by nominees were transferred by the nominees to multiple brokerage accounts controlled by Drage, Mower, and Wilson. The government presented evidence that Wilson controlled eleven brokerage accounts that were managed by four different brokerage firms. His name was listed on only two of these accounts although he had authority over all eleven. Mower controlled seven accounts that were managed by three different brokerage firms. Two were in his name. Drage had account authority over six accounts with three brokerage firms. One was in his name. Twelve additional brokerage accounts were controlled by family members, many of whom also served as nominees in the reverse merger business. For example, Mower's sister, Lisa Valerio, frequently served as a nominee and controlled four brokerage accounts. Mower's mother, who also served as a nominee on several transactions, controlled two brokerage accounts; neither was in her name.

In an exhibit titled, "Story of a Stock Certificate," the government provided the jury with an example of how the post-merger actions of Drage, Mower, and

---

[4]Steve Roberts, one of the IRS revenue agents who worked on the civil audit of Drage, Mower, and Wilson, examined more than one thousand documents relating to eighteen reverse mergers. He testified that he reviewed the entire set of documents "four or five times" and each time it took him two weeks. Another witness, who was employed as a special agent in the IRS criminal investigations unit, testified that a team of eleven agents spent two days looking through the evidence obtained during the search of Drage's office in an attempt to locate Drage's tax returns.

Wilson impeded the ability of the IRS to determine their tax liability by masking the true ownership of the stock. The government's example involved a certificate for 380,000 shares of stock in NetAmerica that was issued to Lisa Valerio on October 15, 1998. Valerio received the stock as compensation for serving as a nominee officer and director.[5] Valerio testified her tasks as nominee included attending one or two meetings, signing documents, and "trying to learn more and more" about the company.

Valerio broke the NetAmerica certificate into eight separate certificates of various denominations on the "guidance" of Drage and Mower. All eight certificates were issued in Valerio's name. Valerio deposited two of the certificates into her brokerage account at Alpine Securities and thereafter sold those shares on the advice of Mower and/or Drage. After the shares were sold, disbursements totaling $1,025,908 were made from the Alpine Securities brokerage account to Valerio's personal bank account at Salt Lake Credit Union. On May 7, 1999, Valerio wrote a check from her bank account to Robert Kroft in the amount of $50,000. She testified this check was written at the direction of

---

[5]Valerio, who is Mower's sister, served as the Vice President of NetAmerica and received the 380,000 shares as compensation for her role in that capacity. The shares were eventually sold for many millions of dollars. Another nominee, Michael Labertew served as President of NetAmerica. He testified he received only $1,000 as compensation for his services as a nominee. *See supra* n.3.

either Drage or Mower and she could not remember its purpose although it may have been for services Kroft performed for the reverse merger business.

On August 8, 2000, Valerio wrote a $200,000 check from her bank account to Nathan Drage Law Firm. The memo line on the check indicated the amount was a loan with an eighteen percent annual interest rate. Valerio testified that despite the size of the loan, there was no loan agreement and Drage provided no collateral. She also testified she converted the loan to an investment on the advice of Drage, Wilson, and Mower. As to this "investment," Valerio's 2000 income tax return indicated she acquired stock in Digital Power on August 8, 2000—the date she made the loan to Drage. Her return also reflected that the stock was sold on December 31, 2000, at a loss of $200,000. None of her brokerage account statements, however, reflected either the purchase or sale of stock in Digital Power. During closing argument, the government asked the jury to infer from this evidence that the transaction was, in reality, a transfer of $200,000 from the NetAmerica reverse merger to Drage that was improperly treated as both a tax-free loan to Drage and as an income tax write-off for Valerio.

The government's exhibit also detailed the steps taken to convert the remaining NetAmerica certificates issued to Valerio into cash and transfer that cash to Drage, Mower, and Wilson. For example, Valerio cancelled two certificates, each representing 100,000 shares, and had them reissued in the name

of DHM Enterprises, LLC, a company Valerio and Mower set up for the benefit of their mother. Valerio testified this was done "under the guidance" of either Mower or Drage. Proceeds from the sale of these shares totaled $3,232,895 and were transferred into bank accounts controlled by DHM Enterprises. Checks for substantial amounts were written from the DHM Enterprises accounts to Nathan Drage Law; Lester Mower; Jeanette Mower; Nathan W. Drage Trust; Nathan W. Drage, P.C.; A-Business Funding; and Global Funding Group, Inc., an entity controlled by Wilson. An additional $746,228 in proceeds from the sale of the NetAmerica stock issued to Valerio was transferred to a bank account controlled by Mower's wife, Jeanette Mower.

Matthew Curtis, a special agent with the IRS also testified at Drage's trial. In June 2004, Curtis was assigned to investigate Mower and his wife. The investigation related to stock sales conducted through Alpine Securities that were not correctly reported on the Mowers' tax returns. Curtis's investigation included gathering and analyzing brokerage and bank accounts. He eventually obtained a warrant to search the office occupied by Drage, Wilson, and Mower. By the time Curtis's review of the records obtained from the office was complete, the investigation had expanded to include Drage and Wilson.

Curtis testified he attempted to catalogue disbursements made between 1999 to 2006 from brokerage accounts controlled by Drage, Wilson, and Mower to bank accounts also controlled by the three men. The brokerage accounts

-8-

contained stock received by Drage, Mower, and Wilson, or their nominees from the reverse merger business. Curtis testified the proceeds from the sale of that stock were co-mingled with other funds in the bank accounts and the funds were repeatedly moved between accounts owned or controlled by Drage, Mower, and Wilson. Specifically, Curtis testified that between 1999 and 2006, Drage, Mower, and Wilson directed 1029[6] separate bank account transfers involving the proceeds from stock they or their nominees received from reverse mergers. Government Exhibit 60-29 detailed these 1029 transfers.

Curtis's testimony also detailed disbursements subsequently made from bank accounts or controlled entities which had received either a brokerage account disbursement or a transfer of funds from a bank account into which brokerage account disbursements had been received. These disbursements were for personal expenses incurred by Drage, Mower, and Wilson. The payments benefitting Mower totaled $1,509,986 and they included the sum of $173,668.12 for mortgage payments on Mower's residence; home improvement expenses totaling $383,980; disbursements from an account controlled by Drage to pay Mower's back taxes; payments covering education expenses for Mower's children, including $53,982 to Intermountain Christian School and $12,536 to Azusa Pacific University; checks from the A-Business Funding account to BMW

---

[6]Curtis's summary of disbursements was limited to those involving $1000 or more.

of Palm Springs for Jeanette Mower's BMW automobile in the total amount of $25,502; other automobile expenses including $43,511 for Mower's Porsche 911 automobile, $1027 for Jeanette Mower's Mercedes CLS 500C, and $2137 for Jeanette Mower's Hummer H2; and disbursements totaling $509,732 directly to Mower, some of which were drawn on a bank account in the name of Nathan W. Drage, P.C. Payments benefitting Wilson totaled $2,298,888 and were very similar to those that benefitted Mower. They included mortgage payments totaling $291,852; home improvement expenses totaling $69,283; payments for luxury automobiles totaling $278,969; credit card payments totaling $294,503; private school tuition totaling $28,700; disbursements of $95,000 to Las Vegas casinos; $743,142 in cash disbursements made directly to Wilson and his wife from entities and accounts controlled by either Wilson or Drage; and transfers totaling $329,136 to a joint personal account controlled by Wilson and his wife.

Like Mower and Wilson, Drage also received more than a million dollars from the bank accounts analyzed by Curtis to pay remarkably similar expenses. The disbursements benefitting Drage included mortgage payments of $189,869; home improvement expenses totaling $19,080; charitable donations of $97,865; payments for private school tuition totaling $15,202; cash disbursements to Drage's wife totaling $668,545 and disbursements to Drage totaling $144,100; expenses relating to the purchase and maintenance of a boat in the amount of $46,043; payments for automobiles totaling $109,836; credit card payments of

$286,064; and three payments for two airplane hangers in the total amount of $125,000. Curtis testified the total of all disbursements benefitting Drage was $1,701,610.

Despite the millions of dollars flowing to Drage, Wilson, and Mower from the reverse merger business, all three failed to file individual income tax returns for many of the relevant years or report any stock sales. Neither Drage nor Wilson filed personal or corporate income tax returns from 2000 to 2006. Mower filed no individual returns from 2003 to 2006.

The jury convicted Drage on both the conspiracy and the failure-to-file counts. Mower and Wilson were tried in a separate proceeding presided over by the same judge. They were convicted of failing to file corporate tax returns but were acquitted of conspiracy. After the judgment in the Mower/Wilson trial, Drage filed a motion for a judgment of acquittal, asking the court to enter an acquittal on the conspiracy count. In the alternative, he asked for the court to vacate the jury's verdict on all counts and grant him a new trial. The district court granted Drage's motion for acquittal, concluding the government did not present "sufficient evidence to prove the existence of an agreement between Drage and Mower and Wilson in furtherance of a conspiracy." The court also conditionally granted Drage's request for a new trial as to the conspiracy count, stating as follows: "Based on the unique circumstances of having heard the evidence in both separate trials of the alleged co-conspirators, there is a serious

-11-

danger that a miscarriage of justice has occurred." It is from these rulings that

the government appeals.

## III. Discussion

### A.    *Jurisdiction*

Before proceeding to the merits, it is necessary to determine whether this

court has jurisdiction over this appeal.[7] Although the district court vacated

Drage's conspiracy conviction, his convictions for violating 26 U.S.C. § 7203 by

willfully failing to file corporate tax returns have not been vacated. Because he

has not yet been sentenced on those convictions, this appeal is interlocutory.

*United States v. Stallings*, 810 F.2d 973, 974 (10th Cir. 1987) ("[A] criminal case

is not final until sentencing is completed."). Our jurisdiction arises, if at all,

under 18 U.S.C. § 3731. That statute states, in relevant part: "In a criminal case

an appeal by the United States shall lie to a court of appeals from a decision,

---

[7]The parties were asked to brief this issue in an order dated January 13, 2016. Curiously, Drage argues this court should not "exercise its jurisdiction" to hear the appeal until after he is sentenced, implying that jurisdiction exists but the matter should be abated. We could find no authority for this approach and Drage cites none. He also argues 18 U.S.C. § 3731 does not permit a government appeal from the grant of a motion for judgment of acquittal because Rule 29 is not mentioned in § 3731. This argument is foreclosed by decades-old Supreme Court and Tenth Circuit precedent. *United States v. Wilson*, 420 U.S. 332, 352-53 (1975) (reading § 3731 as permitting a government appeal from a post-verdict judgment of acquittal); *United States v. Calloway*, 562 F.2d 615, 616-17 (10th Cir. 1977) (same); *see also United States v. Martin Linen Supply Co.*, 430 U.S. 564, 568 (1977) (holding "appeals by the Government from . . . judgments of acquittal" entered under Rule 29 are authorized by 18 U.S.C. § 3731 "unless barred by the Double Jeopardy Clause of the Constitution").

judgment, or order of a district court dismissing an indictment or information or granting a new trial after verdict or judgment, *as to any one or more counts*, or any part thereof . . . ."  *Id*. (emphasis added).

The plain language of § 3731 permits the government to appeal from a post-verdict ruling reversing only one of several convictions.  The statute also instructs that the government's appeal from such a ruling must be "taken within thirty days after the decision, judgment, or order has been rendered."  *Id*.  Because it is typically not possible to sentence a criminal defendant within the thirty-day period, these two provisions, when read together, support the conclusion that this court's jurisdiction over interlocutory criminal appeals is not affected by the fact a defendant has not yet been sentenced on any remaining counts.  *See United States v. Carrillo-Bernal*, 58 F.3d 1490, 1491-92 (10th Cir. 1995) ("Section 3731 governs interlocutory government appeals in a criminal case . . . .").  Accordingly, we have jurisdiction and proceed to the merits of the government's appeal.

*B.      Judgment of Acquittal*

Rule 29(c)(2) of the Federal Rules of Criminal Procedure permits a court to set aside a guilty verdict and enter a judgment of acquittal.  The grant of a Rule 29(c)(2) post-verdict acquittal is reviewed de novo.  *United States v. Ching Tang Lo*, 447 F.3d 1212, 1221 (9th Cir. 2006).  Here, the district court ruled the government's evidence was insufficient to sustain Drage's conspiracy conviction.

-13-

When this court reviews the sufficiency of the evidence presented at trial, we draw all reasonable inferences "therefrom in the light most favorable to the government." *United States v. Hale*, 762 F.3d 1214, 1222 (10th Cir. 2014). In conducting our review, we defer to the jury's verdict and do not weigh conflicting evidence or consider witness credibility. *United States v. Dewberry*, 790 F.3d 1022, 1028 (10th Cir. 2015). A conviction should be reversed "only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Hale*, 762 F.3d at 1222-23 (quotation omitted). Thus, the district court's post-verdict acquittal is improper if a rational jury could have found Drage guilty of conspiracy beyond a reasonable doubt.

Drage was charged with, and convicted of, violating 18 U.S.C. § 371, which makes it a federal crime for two or more persons to conspire to defraud the United States. The indictment alleged the objective of the conspiracy was to defraud the United States "by impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service in the ascertainment, computations, assessment, and collection of revenue, that is, federal income taxes." To secure a conviction on the § 371 conspiracy charge, the government was required to show (1) Drage agreed with another person to violate the law; (2) he knew the essential objective of the conspiracy; (3) his involvement was knowing and voluntary; (4) there was interdependence among the coconspirators; and (5) an overt act in furtherance of the conspiracy was

committed. *United States v. Bedford*, 536 F.3d 1148, 1156 (10th Cir. 2008). In his motion for judgment of acquittal, Drage argued there was insufficient evidence he had an agreement with either Mower or Wilson to impair or impede the IRS.

In its order granting Drage's request for an acquittal, the district court was influenced, in part, by the notion that Drage, Mower, and Wilson all reported some income from stocks sales during the relevant period and "there were several returns prepared for many of the years at issue." Drage repeats this justification in his appellate brief. The district court's statement is erroneous for two reasons. First, and most glaring, is that the evidence showed Drage and Wilson never reported any income from stock sales from 1999 to 2006.[8] Mower reported stock sales on joint returns he filed in 2000, 2001, and 2002. Mower did not file a joint or individual return in 1999 or 2003 to 2006 and, thus, reported no income from stock sales.

Second, although the district court correctly noted tax returns were prepared for many of the years at issue, that fact does not support the court's conclusion that Drage, Mower, and Wilson "made full disclosures of the income attributable to each" to their individual accountants. Contrary to the court's statement, there was no evidence Drage fully disclosed his income to Mark

---

[8]Neither Drage nor Wilson filed individual income tax returns from 2000 to 2006. On the returns they filed in 1999, each reported zero income from stock sales.

-15-

Berrett, the accountant he retained in 2004. Mr. Berrett prepared Drage's returns based on information he received from Drage. He testified the 2001 personal income tax return he prepared for Drage showed one sale of stock in that year, resulting in a long term capital gain of $232. Drage's 2002 return showed no capital gains and no stock sales. Mower's accountant, Kent Fitzgerald, and Wilson's accountant, James Downward, testified they were retained in 2004 and 2005, respectively, to prepare prior years' returns based on documents supplied by Mower and Wilson. There was no testimony or other evidence confirming that the records Drage, Mower, and Wilson provided to their accountants were accurate or complete. In light of the government's evidence showing Drage, Mower, and Wilson were the beneficial owners of stock held and sold by nominees, the jury could reasonably conclude, contrary to the district court's statement, that the information the three men provided to their accountants as to their capital gains from stock sales was inaccurate or incomplete. Further, there was no evidence Drage, Mower, or Wilson ever filed the returns prepared by Berrett, Fitzgerald, and Downward.

Even assuming Drage, Mower, and Wilson provided their accountants with full and accurate information, the failure of all three to file the prepared returns supports the government's position they had a common agreement to violate the law. Specifically, the evidence showed (1) Drage, Mower, and Wilson rarely, if at all, filed income tax returns during the relevant period; (2) all three men

retained accountants to prepare prior years' returns only after the government began investigating Mower and his wife; and (3) none of the men filed those returns. Construed in the light most favorable to the government, a reasonable jury could infer from this similar, yet unusual, behavior that Drage, Mower, and Wilson had an agreement not to file the prior years' returns because they would provide the IRS with information it could use to accurately assess their tax liability.[9] The district court erred by weighing conflicting evidence as to Drage, Mower, and Wilson's tax returns and failing to view all the evidence in the light most favorable to the government. *United States v. White*, 673 F.2d 299, 301-02 (10th Cir. 1982) (reiterating that the district court must view all the evidence in the light most favorable to the government and is precluded from weighing conflicting evidence).

"To demonstrate the existence of a conspiratorial agreement it simply must be shown that there was a single plan, the essential nature and general scope of which was known to each person who is to be held responsible for its consequences." *Snell v. Tunnell*, 920 F.2d 673, 702 (10th Cir. 1990) (quotations and alteration omitted). Further, a conspiratorial agreement may be implicit and a "jury may infer conspiracy from the defendants' conduct and other circumstantial evidence indicating coordination and concert of action." *United States v. Dazey*,

---

[9]Steve Roberts, an IRS revenue agent, testified that a nominee does not recognize any income from the sale of stock. The income, instead, must be recognized by the beneficial owner.

-17-

403 F.3d 1147, 1159 (10th Cir. 2005). The government presented evidence that Drage, Mower, and Wilson had a close working relationship and were all involved in the same reverse merger business. William Chipman, an individual who played a role in at least one reverse merger testified Wilson found the deals, Mower structured them, and Drage prepared all the legal documents. The government's evidence showed that all three men engaged in identical post-merger conduct: all received stock in the post-merger company (or proceeds from the sale of that stock) directly or indirectly from a nominee in the form of distributions to brokerage accounts they owned or controlled; all engaged in the very unusual activity of repeatedly moving the proceeds from the sale of the stock from one bank account to another, co-mingling the proceeds with other monies in the bank accounts; all used the proceeds to pay personal expenses; and none reported the income from the stock sales. Based on evidence Drage, Mower, and Wilson all engaged in post-merger conduct that was unusual and coordinated, the jury could reasonably infer the three men did not each independently devise the same post-merger process but that they collectively formulated a common plan intended to obfuscate the beneficial ownership of stock. The government's evidence also showed that Drage, Mower, and Wilson had ample opportunity to devise and perpetuate this scheme. There was testimony the three men shared office space, a receptionist, a main phone line, and support staff. The receptionist testified the three "made their decisions together" and met daily behind closed doors.

Properly considered in the light most favorable to the government, this evidence is sufficient to support a finding Drage, Mower, and Wilson had a conspiratorial agreement.

Having concluded the evidence was sufficient to show an agreement, we next consider whether that agreement was unlawful. The district court ruled in Drage's favor on this point, assuming there was an agreement but concluding there was insufficient evidence the objective thereof was to impede the IRS. The court was persuaded by Drage's argument that none of the post-merger activity in which he, Mower, or Wilson engaged was illegal. Specifically, there was no evidence of any illegality in the reverse mergers themselves, the use of nominees to facilitate reverse mergers, the use of nominees to hold stock, or the repeated transfers of money from bank account to bank account. According to the district court, this lack of evidence was fatal to the government's case because "[m]aking the job of the IRS more difficult is not tantamount to conspiring to violate the law." The court identified the only evidence of illegality as the failure of Drage, Mower, and Wilson to file returns for some of the years in question. It concluded that lone fact was insufficient to support the jury's verdict.

The district court is correct that there was nothing unlawful about the majority of the individual acts in which Drage, Mower, and Wilson engaged and the government does not argue otherwise. The government, however, is not required to show that all the individual acts in which coconspirators engaged were

-19-

themselves illegal. Evidence is sufficient to show an unlawful agreement for purposes of § 371 if it indicates the obstruction of lawful governmental functions was accomplished by "deceit, craft or trickery, or at least . . . means that are dishonest." *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924).

In *United States v. Brunetti*, this court affirmed the convictions of individuals charged with conspiring to defraud the IRS in violation of § 371, who devised "a plan to purchase and sell stock at a gain without reporting it as taxable income." 615 F.2d 899, 903 (10th Cir. 1980). The evidence showed the defendants engaged in the following activities: "Purchases of stock were made at a low price from unknowledgable sellers. The shares thus purchased were transferred into shares of subsidiary or related corporations. Stock splits ensued. Transfers were often through nominees, who arranged the ultimate sale of the stock thus acquired." *Id*. Although none of those individual acts were unlawful, this court held the evidence was "legally sufficient" to support the defendants' convictions. *Id*. The district court's ruling on the legality of the coconspirators' individual acts is inconsistent with *Brunetti*. Consequently, the district court erred in refusing to consider the considerable evidence showing the agreement between Drage, Mower, and Wilson was illegal even if that evidence did not show anything "*per se* illegal about the alleged business activity between Mower, Wilson, and Drage."

The jury heard extensive evidence from which it could find that Drage, Mower, and Wilson knowingly agreed to engage in identical post-merger activity that impeded the ability of the IRS to trace beneficial ownership of the stock or the proceeds from its sale. As an example, evidence showed that the nominee who served as president in the NetAmerica reverse merger received $1000 as compensation whereas a second nominee, Mower's sister Lisa Valerio, received 328,000 shares of stock in NetAmerica as compensation for her role as vice-president. Additional evidence showed that Valerio subsequently transferred this stock or some of the proceeds from the sale of the stock to Drage, Mower, and Wilson, or entities controlled by them. She did so at their direction. From this evidence, the jury could reasonably infer that stock received by nominees was actually held for the benefit of Drage, Mower, and Wilson. The evidence further showed that (1) the stock beneficially owned by Drage, Mower, and Wilson was held in multiple brokerage accounts, many of which were not in their names; (2) during the relevant period, the three men repeatedly, and without any apparent justification, moved funds between more than thirty bank accounts managed by multiple banks, many of which were not in their names; (3) money was distributed from the bank accounts to pay personal expenses; and (4) Drage and Wilson failed to file income tax returns or report any stock sales to the IRS from 2000 to 2006 and Mower failed to report stock sales from 2003 to 2006. Viewed as a whole and properly construed in the light most favorable to the government,

this evidence is sufficient to show the scheme in which Drage, Mower, and Wilson engaged was designed to obfuscate the true ownership of both stock and any gains from the sale thereof in a way that would impede the ability of the IRS to compute each man's income taxes. A jury could infer from the coordination and complexity of the financial maneuvering undertaken by Drage, Mower, and Wilson—much of which was atypical and made the operation of their reverse merger business unnecessarily complicated—coupled with the failure of all three men to report income from the stock sales, that the purpose of the maneuvering was to avoid paying income taxes by making it impossible for the IRS to trace their ownership of the stock.

Having reviewed all the relevant evidence in the light most favorable to the government, we have no hesitation concluding a reasonable jury could find that Drage conspired with Mower and Wilson to engage in coordinated action to achieve the common goal of receiving income from a reverse merger business and impeding the ability of the IRS to correctly calculate that income.

*C.    New Trial*

Rule 29(d)(1) of the Federal Rules of Criminal Procedure provides that "[i]f the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed." Under Rule 33, a court may order a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33.

After granting Drage's motion for judgment of acquittal, the district court also conditionally granted his request for a new trial. We review the grant of a motion for new trial under the abuse of discretion standard. *United States v. Evans*, 42 F.3d 586, 593 (10th Cir. 1994).

The district court's discussion on the matter of a new trial was brief. It stated: "Based on the unique circumstances of having heard the evidence in both separate trials of the alleged co-conspirators, there is a serious danger that a miscarriage of justice has occurred." It further noted that a miscarriage of justice occurs when "an innocent person has been convicted." Because we have already concluded the evidence was sufficient to support the jury's guilty verdict, there was no miscarriage of justice of the type identified by the district court. In any event, after a thorough review of the record, we have no doubt it would be unreasonable to conclude Drage's conspiracy conviction is against the great weight of the evidence. *See United States v. Gabaldon*, 91 F.3d 91, 93-94 (10th Cir. 1996). Instead, as described at length above, the jury's verdict is amply supported by the evidence. Accordingly, the district court abused its discretion when it conditionally granted Drage a new trial.

## IV.     Conclusion

The judgment of the district court is **reversed**.  The matter is **remanded** to the district court with instructions to reinstate the verdict of the jury and deny Drage's motion for a new trial.

ENTERED FOR THE COURT


Michael R. Murphy
Circuit Judge