13-3661-cr
United States v. Kimber

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2014

(Argued: December 5, 2014     Decided: January 30, 2015)

Docket No. 13-3661-cr

UNITED STATES OF AMERICA,

*Appellee*,

— v. —

MARTIN KIMBER,

*Defendant-Appellant*.

B e f o r e :

SACK, LYNCH and CHIN, *Circuit Judges*.

Defendant-Appellant Martin Kimber appeals from a judgment of conviction following his guilty plea to use and possession of a chemical weapon in violation of 18 U.S.C. § 229(a)(1) and consumer product tampering in violation

1

of 18 U.S.C. § 1365(a).  Kimber principally argues that his conduct is not covered by § 229(a)(1) in light of the Supreme Court's decision in <u>Bond v. United States</u>, –––– U.S. ––––, 134 S. Ct. 2077 (2014), and that the district court erred in applying sentencing adjustments based on (I) Kimber's use of a special skill in the commission of his offenses and (ii) the vulnerability of the victims of his offenses. We conclude that § 229(a)(1) does reach Kimber's conduct and that the challenged sentencing adjustments were proper.

AFFIRMED.

––––––––––

JOHN NICHOLAS IANNUZZI, Iannuzzi and Iannuzzi, New York, New York, *for Defendant-Appellant* Martin Kimber.

RAJIT S. DOSANJH, Assistant United States Attorney (Craig A. Benedict, Assistant United States Attorney, *on the brief*), *for* Richard S. Hartunian, United States Attorney for the Northern District of New York, Syracuse, New York.

––––––––––

GERARD E. LYNCH, *Circuit Judge*:

Defendant-Appellant Martin Kimber pled guilty in the United States District Court for the Northern District of New York (Lawrence E. Kahn, *Judge*) on November 29, 2012 to an information charging him with one count of use of a

chemical weapon in violation of 18 U.S.C. § 229(a)(1) ("Count One"), one count of possession of a chemical weapon in violation of 18 U.S.C. § 229(a)(1) ("Count Two"), and one count of consumer product tampering in violation of 18 U.S.C. § 1365(a) ("Count Three"). The charges arose from Kimber's dispersing liquid mercury at the Albany Medical Center ("AMC") in Albany, New York on four separate occasions between March 2011 and March 2012 in an effort to disrupt the facility's services in retaliation for what he considered to be substandard care and excessive billing. Kimber was sentenced on September 19, 2013 principally to 168 months' imprisonment on Counts One and Two, and 120 months' imprisonment on the Count Three, to run concurrently.

On appeal, Kimber challenges his conviction on Counts One and Two, arguing that his conduct is not covered by § 229(a)(1) in light of the Supreme Court's decision in Bond v. United States, —— U.S. ——, 134 S. Ct. 2077 (2014) ("Bond II"). He also claims that his counsel below was ineffective for failing to raise such a challenge. Additionally, Kimber argues that his sentence was procedurally unreasonable because the sentencing court erred in: (i) applying a two-level offense adjustment for use of a special skill in the commission of the offenses; (ii) applying a two-level adjustment for the vulnerability of the victims

3

of the offenses; (iii) failing to adequately consider the factors enumerated in 18 U.S.C. § 3553(a); and (iv) failing to adequately explain its choice of sentence. We conclude that § 229(a) reaches Kimber's conduct and that his sentence was not procedurally unreasonable. We therefore AFFIRM the judgment of the district court.

## BACKGROUND

After receiving medical treatment from the AMC in December 2010, Martin Kimber grew irate over what he considered to be substandard care and excessive billing. A New York licensed pharmacist for thirty-six years, he decided to retaliate by dispersing elemental mercury throughout the AMC for the stated purpose of "causing panic at the hospital [and its] cafeteria and an attendant loss of business when people became fearful of gaining treatment and eating there." J. App'x at 21. Elemental mercury is a neurotoxin that can be absorbed through ingestion, contact with unbroken skin or, if evaporated, through inhalation. Once in the body, mercury enters the bloodstream and can linger for years. It can cause death, brain and nervous system damage, and other serious bodily injuries, with particularly severe effects on young children and in utero fetuses.

4

On March 28, 2011, Kimber drove the fifty miles to the AMC from his home in Ruby, New York to launch his first of four attacks. He deposited several pounds of mercury in various sections of the AMC, including outside a post-operative care unit and near the triage window in the emergency room. The attack caused hospital officials to close the emergency room while emergency response units collected the mercury, delaying care for many waiting patients. Kimber returned to the AMC for three additional attacks. He deposited another one to two pounds of mercury in an AMC hallway and bathroom on April 11, 2011, and another approximately two pounds in an AMC corridor and pedestrian ramp on June 23, 2011. The fourth attack, on March 2, 2012, focused on the AMC cafeteria. Kimber placed mercury in, among other places, a salad bar, a toaster, a freezer, and in a container of chicken tenders being warmed under a heat lamp. An AMC employee who purchased the chicken tenders was taken to the emergency room after potentially ingesting the mercury. Luckily, neither she nor anyone else suffered mercury poisoning from the attacks.

Prior to the fourth attack, the AMC had installed additional security cameras in response to the previous incidents. The local news displayed photographs of a suspect taken from the security footage, and the Albany Police

Department received three tips identifying the suspect as Kimber. On March 29, 2012, Kimber was arrested at his home. Officers seized a container of mercury from Kimber's car and another from his garage.

Kimber pled guilty to the information on November 29, 2012. Under the terms of his plea agreement, Kimber waived his right to appeal or collaterally attack his conviction and any sentence of imprisonment of 120 months or less. The plea agreement included a section titled "Factual Basis for the Plea." In that section, Kimber acknowledged that the purpose of his attacks was "to retaliate for hospital bills that he felt were unfair by causing panic at [AMC's] hospital/cafeteria and an attendant loss of business when people became fearful of gaining treatment and eating there." J. App'x at 21. Kimber admitted that he understood mercury's harmful effects on humans and that "to receive and maintain his license and work as a licensed pharmacist, [he] received education and training on the effects, harmful and otherwise, of chemicals and substances on the human body, as well as how to research such effects." Id. at 19. Kimber also acknowledged that he understood "that the heating of elemental mercury, including the placing of mercury on or in toasters, and on or around heated food, greatly increased the likelihood that mercury would vaporize into the air and be

6

inhaled by individuals consuming such food or . . . [located] near such heating devices." Id. at 19-20.

The Presentence Investigation Report ("PSR"), issued on July 30, 2013, elaborated on the risks inherent in Kimber's attacks. It noted that elemental mercury is a "silvery liquid at room temperature" that has a "very high vapor pressure and readily evaporates into the air at room temperature[,] where it can cause an extreme hazard if inhaled." PSR ¶ 40. The PSR found that "[a]t room temperature mercury is highly volatile and absorbed into the blood with efficiency approaching 80% by inhalation" and that, at temperatures reached in a toaster, even a teaspoon of mercury can cause concentration levels within five feet to exceed "30 times the observable toxic effect level for persistent nervous system damage." PSR ¶ 42.

The PSR calculated a base offense level of 28 and recommended a four-level increase for "substantial disruption of public, governmental, or business functions or services" pursuant to U.S.S.G. § 2M6.1(b)(3), a two-level increase for use of a special skill in the commission of the offenses pursuant to U.S.S.G. § 3B1.3, and a three-level decrease for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. The resulting total offense level of 31 and criminal history

7

category of I yielded a Guidelines range of 108 to 135 months.

Kimber did not contest the facts presented in the PSR but challenged the two-level increase for use of a special skill on the ground that the offenses, as committed, involved no special skill. For its part, the government argued that the PSR was mistaken in not recommending an additional two-level increase pursuant to U.S.S.G. § 3A1.1, which applies "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim." The PSR explained that "a victim-related adjustment was considered in view of the commission of the offense at a hospital wherein individuals who are vulnerable due to their physical condition could potentially have been victimized, such as patients in the emergency room," but the adjustment was not recommended because "no known vulnerable victims have been identified as being impacted or targeted by the offense." PSR ¶ 73. The government contended that patients whose care was delayed when Kimber's attack shut down AMC's emergency room were victims of his offenses, and that § 3A1.1 did not require that a victim be targeted because of her vulnerability.

Kimber was sentenced on September 19, 2013. The court adopted the findings and recommendations of the PSR, except that it applied a two-level

vulnerable victim adjustment because:

> [the AMC] has confirmed that at the time of the mercury attacks there were patients in the impacted areas who were critically ill and not in a position to seek treatment at another hospital or otherwise in a position to protect themselves. Additionally, the executive vice president and chief operating officer of the [AMC] has stated that the facility is the sole trauma center for 150 miles in all directions with over 3 million people in this service area.

J. App'x at 142. This resulted in a revised offense level of 33 and a Guidelines range of 135 to 168 months. Stating that it had considered the relevant factors under 18 U.S.C. § 3553(a), the court sentenced Kimber principally to 168 months on Counts 1 and 2, and 120 months on Count 3, to run concurrently. The court explained that it had imposed a sentence at the top of the Guidelines range because:

> the guidelines do not take into consideration the fact that the defendant dispensed mercury at the [AMC] on four separate occasions, one of which was directly into food which was readily available for consumption by employees, visitors and [the] general public. Furthermore, the defendant substantially endangered public health and safety, acting in a manner which was deliberate, planned and in doing so, significantly caused a risk for public health and security.

J. App'x at 143. Kimber did not object to the court's explanation for the sentence, its consideration of the § 3553(a) factors, or its application of the vulnerable-victim adjustment.

9

The terms of the plea agreement permitted Kimber to appeal his sentence because it exceeded 120 months. He did so on September 23, 2013, arguing that the sentencing court had erred in applying the special-skill and vulnerable-victim adjustments, and in failing to adequately explain its sentence or consider the § 3353(a) factors. On June 2, 2014, after Kimber had filed his principal brief, the Supreme Court in <u>Bond II</u> vacated a conviction under § 229(a)(1) on the grounds that the provision "does not cover the unremarkable local offense" of "an amateur attempt by a jilted wife to injure her husband's lover [with chemicals], which ended up causing only a minor thumb burn." 134 S. Ct. 2077, 2083 (2014). Kimber sought and obtained leave to file a supplemental brief addressing whether his conduct violated § 229(a)(i) in light of <u>Bond II</u>. The government elected not to seek enforcement of Kimber's appeal waiver with respect to this challenge. Kimber also argued in his supplemental brief that his counsel below was ineffective for failing to challenge Kimber's prosecution under § 229(a)(1).

**DISCUSSION**

I.      Convictions under 18 U.S.C. § 229(a)(1) and Ineffective Assistance Claim

      A.      Chemical Weapons Convention Implementation Act of 1998

Congress enacted the Chemical Weapons Convention Implementation Act of 1998 (the "Implementation Act"), 112 Stat. 2681–856, to implement the Convention on Chemical Weapons (the "Convention"), ratified by the United States in 1997. The Convention, prompted in part by the 1995 Tokyo subway attacks, aimed "to expand the prohibition on chemical weapons beyond state actors in wartime." Bond II, 134 S. Ct. at 2084. Accordingly, the Implementation Act makes it "unlawful for any person knowingly . . . to develop, produce, otherwise acquire, transfer directly or indirectly, receive, stockpile, retain, own, possess, or use, or threaten to use, any chemical weapon." 18 U.S.C. § 229(a)(1). "Chemical weapon" is defined broadly as any "toxic chemical and its precursors." Id. § 229F(1)(A). "Toxic chemical," in turn, is defined as "any chemical which through its chemical action on life processes can cause death, temporary incapacitation or permanent harm to humans or animals." Id. § 229F(8)(A). The Implementation Act excludes from the definition of "chemical weapon" any chemicals and precursors "intended for a purpose not prohibited

11

under this chapter," defined in part as "[a]ny peaceful purpose related to an industrial, agricultural, research, medical, or pharmaceutical activity or other activity." Id. §§ 229F(1)(A), 229F(7)(A). Violation of § 229 is punishable by imprisonment "for any term of years," or if a victim's death results, the death penalty or imprisonment "for life." Id. § 229A(a).

B.    *Bond II*

The Bond saga began when Carol Anne Bond, a microbiologist from Lansdale, Pennsylvania, learned in 2006 that her husband was having an affair with her best friend, Myrlinda Haynes. She did not take the news well. On at least two dozen occasions, Bond placed on Haynes's car door, mailbox, and door knob a mixture of 10-chloro-10H-phenoxarsine, an arsenic-based compound that Bond had stolen from her employer, and potassium dichromate, a chemical commonly used in cleaning laboratory equipment that Bond had purchased on the internet. While both chemicals are toxic and potentially lethal in high doses, Bond did not intend to kill Haynes, hoping instead that Haynes "would touch the chemicals and develop an uncomfortable rash." Bond II, 134 S. Ct. at 2085. Haynes was able to avoid the easily visible chemicals all but one time, when she "suffered a minor chemical burn on her thumb, which she treated by rinsing with

12

water." Id. Bond was charged with two counts of possessing and using a chemical weapon, in violation of § 229(a)(1). After entering a conditional guilty plea, she challenged her conviction, arguing that the Implementation Act was an unconstitutional encroachment on state sovereignty under the Tenth Amendment. The Third Circuit held that Bond lacked standing to bring such a challenge, United States v. Bond, 581 F.3d 128 (3d Cir. 2009), and the Supreme Court reversed without expressing a view on the merits. Bond v. United States, 564 U.S. at ----, 131 S. Ct. 2355 (2011) ("Bond I"). On remand, Bond renewed her constitutional argument and, alternatively, contended that the Implementation Act did not reach her conduct. The Third Circuit rejected both arguments, holding that the Implementation Act clearly covered Bond's conduct and was a constitutional exercise of Congress's authority to enact treaty-implementing legislation under the Necessary and Proper Clause. United States v. Bond, 681 F.3d 149 (3d Cir. 2012).

The Supreme Court again reversed, concluding that the Implementation Act expressed no clear intention to reach local criminal activity traditionally left to the states. Bond II, 134 S. Ct. at 2083. Absent such a clear intention, the Court held that § 229(a)(1) "does not cover the unremarkable local offense" of "an

13

amateur attempt by a jilted wife to injure her husband's lover, which ended up causing only a minor thumb burn." Id. at 2083. The Court reasoned that to hold otherwise would "transform the statute from one whose core concerns are acts of war, assassination, and terrorism into a massive federal anti-poisoning regime that reaches the simplest of assaults." Id. at 2091-92.

The Court explained that the applicability of § 229(a)(1) depends on "both the particular chemicals that the defendant used and the circumstances in which she used them." Id. at 2090. No reasonable observer when describing Bond's "act of revenge born of romantic jealousy" would say "that a chemical weapon was deployed in Norristown, Pennsylvania." Id. at 2091. Moreover, the Court observed that the chemicals Bond used "bear little resemblance to the deadly toxins that are of particular danger to the objectives of the Convention." Id. at 2090 (internal quotation marks omitted). Those same chemicals might, however, be chemical weapons "if used, say, to poison a city's water supply." Id. at 2091.

The Court's water-supply hypothetical formed part of its explanation that the Bond "case is unusual, and [the Court's] analysis is appropriately limited." Id. at 2093. The Court recognized the federal government's "substantial interest in enforcing criminal laws against assassination, terrorism, and acts with the

potential to cause mass suffering" and explained that its holding "will [not] disrupt the Government's authority to prosecute such offenses." Id. at 2092. It contrasted the facts of Bond with those of the "handful of [other] prosecutions that have been brought under [§ 229] . . . [m]ost of [which] involved either terrorist plots or the possession of extremely dangerous substances with the potential to cause severe harm to many people." Id. For example, in United States v. Crocker the defendant attempted to acquire chlorine gas and VX nerve gas in order to attack a federal courthouse. 260 F. App'x 794 (6th Cir. 2008). And in United States v. Fries the defendant set off a homemade chlorine bomb, requiring evacuation of a residential neighborhood. No. CR–11–1751, 2012 WL 689157 (D. Ariz., Feb. 28, 2012).

C.     Applying § 229(a)(1) to Kimber's Conduct in Light of Bond II

Kimber argues that Bond II precludes his prosecution under the Implementation Act because, as in that case, his crime was purely local, caused no significant injury, and involved a commercially available chemical. Each of these contentions ignores important distinctions from Bond II.

To begin, we reject Kimber's characterization of his offenses as purely local. Kimber did not place liquid mercury at the private residence or on the

15

personal vehicle of a neighbor. Instead, he targeted an institution fifty miles from his home that provides the public with vital services. Exposing many members of the public to a dangerous chemical presents a far cry from the "local assault[s]" aimed at one individual at issue in Bond II. 134 S. Ct. at 2093. Moreover, the AMC is the only trauma center for 150 miles in all directions, meaning that its disruption could affect entire regions of New York and neighboring states.

That Kimber's attacks happened not to cause significant injury is not dispositive. Rather, it is sufficient that he placed many people at risk of serious harm. As Bond II explains, § 229(a)(1) applies to "acts with the *potential* to cause mass suffering" and "substances with the *potential* to cause severe harm to many people." 134 S. Ct. at 2092 (emphasis added). Unlike Bond, Kimber placed chemicals in highly trafficked public locations, where many people would naturally be exposed. At temperatures reached in a toaster, even a teaspoon of mercury can cause concentration levels within five feet to exceed "30 times the observable toxic effect level for persistent nervous system damage." PSR ¶ 42(c). And while vaporized mercury posed perhaps the most acute risk, dispersing liquid mercury throughout the AMC likewise exposed AMC staff and visitors to

16

a risk of significant harm. To choose but one example, an AMC cafeteria customer might easily have placed her hand in the freezer to retrieve food and absorbed mercury through her unbroken skin.

Nor is the commercial availability of mercury dispositive. Section 229 clearly extends to commercially available chemicals by exempting some chemicals covered by the Implementation Act when they are used for "peaceful purpose[s] related to an industrial, agricultural, research, medical or pharmaceutical activity." 18 U.S.C. § 229F(7)(A). For example, chlorine is commercially available, yet, as Bond II suggested, it may serve as a chemical weapon when used to make a chlorine bomb. 134 S. Ct. at 2092, citing Crocker, 260 F. App'x 794, and Fries, 2012 WL 689157. The chemicals at issue in Bond II were also commercially available and "b[ore] little resemblance to the deadly toxins that are of particular danger to the objectives of the Convention." Id. at 2090 (internal quotation marks omitted). Nevertheless, the Court noted that those very chemicals might be fairly classified as chemical weapons if used to poison a city's water supply. Id. at 2091.

Thus, we consider not only the "particular chemicals that the defendant used" but also "the circumstances in which [he] used them." Id. at 2090. In stark

17

contrast to the facts of <u>Bond</u>, Kimber's acts – in addition to having "the potential to cause severe harm to many people," <u>id</u>. at 2092 – were calculated to provoke fear among the public and thereby affect its behavior. Kimber explained that the purpose of the attacks was "to retaliate [against AMC] by causing panic at the hospital/cafeteria and an attendant loss of business when people became fearful of gaining treatment and eating there." J. App'x at 21. Kimber's stated purpose of coercing and intimidating the public into forgoing treatment at the AMC renders his conduct quintessential terrorism. <u>See</u> Webster's Ninth New Collegiate Dictionary 1218 (1985) (defining "terrorism" as "the systematic use of terror esp[ecially] as a means of coercion"); <u>cf</u>. 18 U.S.C. § 2331(5) (defining "domestic terrorism," in part, as "activities that . . . involve acts dangerous to human life that are a violation of the criminal laws of the United States . . . [and] appear to be intended . . . to intimidate or coerce a civilian population"). The Supreme Court made clear in <u>Bond II</u> that the "Federal Government undoubtedly has a substantial interest in enforcing criminal law against . . . terrorism," 134 S. Ct. at 2092, and that addressing acts of terrorism was a "core concern" of the Implementation Act, <u>id</u>. at 2091-92.

We therefore conclude that Kimber's attempt to deter the public from seeking treatment at a regionally important medical center for fear of exposure to a dangerous chemical violates § 229(a)(1).

D. Ineffective Assistance Claim

Kimber contends that his counsel below was ineffective for failing to challenge his prosecution under § 229(a)(1). He argues that, although Bond II was not decided until after his guilty plea in 2013, its holding should have been anticipated in light of the Supreme Court's ruling in Bond I in 2011 that Bond had standing to challenge the Implementation Act. Kimber has also submitted an affidavit stating that, had he known that the charges under § 229(a)(1) were susceptible to challenge, he would not have entered into the plea agreement.

When a claim of ineffective assistance of counsel is raised on direct appeal, we may: "(1) decline to hear the claim, permitting the appellant to raise the issue as part of a subsequent petition for writ of habeas corpus pursuant to 28 U.S.C. § 2255; (2) remand the claim to the district court for necessary factfinding; or (3) decide the claim on the record before us." United States v. Morris, 350 F.3d 32, 39 (2d Cir. 2003). "[I]n most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective assistance." Massaro v. United

19

States, 538 U.S. 500, 504 (2003); see also United States v. Khedr, 343 F.3d 96, 99-100 (2d Cir. 2003). However, we may decide ineffective assistance claims on direct appeal "when their resolution is beyond any doubt or to do so would be in the interest of justice." United States v. Griffiths, 750 F.3d 237, 241 n.4 (2d Cir. 2014), quoting Khedr, 343 F.3d at 100. Here, resolution of Kimber's ineffective assistance claim on direct appeal is appropriate because the claim depends entirely on a legal question – the applicability of § 229(a)(1) to his conduct – that is the subject of Kimber's appeal on the merits.

"Ineffective assistance of counsel during plea negotiations can invalidate a guilty plea and make granting withdrawal appropriate, to the extent that the counsel's deficient performance undermines the voluntary and intelligent nature of defendant's decision to plead guilty." United States v. Arteca, 411 F.3d 315, 320 (2d Cir. 2005). Under the familiar Strickland test, to establish an ineffective assistance claim Kimber must show that his counsel's conduct "fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would

20

have been different." Strickland v. Washington, 466 U.S. 668, 688, 694 (1984).[1]

Kimber's claim fails at the first prong, as he cannot show that his counsel was constitutionally deficient in failing to challenge his prosecution under § 229(a)(1). At the time of Kimber's guilty plea, the Supreme Court had not granted certiorari to hear Bond II, and no federal appellate court, let alone the Supreme Court, had held that the Implementation Act did not reach conduct that might be described as "local." "[A]n attorney is not required to forecast changes or advances in the law in order to provide effective assistance." McCoy v. United States, 707 F.3d 184, 188 (2d Cir. 2013) (internal quotation marks omitted). Moreover, as this opinion explains, § 229(a)(1) covers Kimber's conduct even in light of Bond II. Because a challenge to the applicability of § 229(a)(1) to Kimber's conduct fails, Kimber's counsel was not ineffective for failing to raise it. See Aparicio v. Artuz, 269 F.3d 78, 99 n.10 (2d Cir. 2001) ("Because [Petitioner's] claim was meritless, Petitioner's trial counsel was not ineffective for failing to raise it.").

---

[1] "To satisfy the second prong of Strickland in the context of plea negotiations, the defendant must show that there is a reasonable probability that were it not for counsel's errors, he would not have pled guilty and would have proceeded to trial." Arteca, 411 F.3d at 320. Moreover, "to obtain relief on this type of claim, [Kimber] must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." Padilla v. Kentucky, 559 U.S. 356, 371-72 (2010).

21

## II. Sentencing Challenges

Kimber argues that his sentence was procedurally unreasonable because the sentencing court erred in: (I) applying a two-level offense adjustment for use of a special skill in the commission of the offenses; (ii) applying a two-level adjustment for the vulnerability of the victims of the offenses; (iii) failing to adequately consider the factors enumerated in 18 U.S.C. § 3553(a); and (iv) failing to adequately explain its choice of sentence. We review de novo the legal question of what constitutes a special skill and review for clear error a sentencing court's finding that use of a special skill significantly facilitated the commission of an offense. United States v. Spencer, 4 F.3d 115, 120 (2d Cir. 1993). Because Kimber challenged only the application of the special skill adjustment before the sentencing court, we review his other claims for plain error, asking "whether there was: (1) an error; (2) that was plain; (3) that affected defendant's substantial rights; and (4) that seriously affected the fairness, integrity or public reputation of judicial proceedings." United States v. Morris, 350 F.3d 32, 36 (2d Cir. 2003) (alterations and internal quotation marks omitted).

### A. Special Skill Adjustment

The district court adjusted Kimber's offense level upward by two levels under U.S.S.G. § 3B1.3, which applies "[i]f the defendant . . . used a special skill,

22

in a manner that significantly facilitated the commission or concealment of the offense." An application note to this provision defines a "special skill" as "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing," and includes chemists as an example of those possessing a special skill. U.S.S.G. § 3B1.3 cmt. n.4.

Kimber does not contest that as a licensed pharmacist he *possessed* a relevant special skill: namely, a knowledge of chemicals and their effect on the human body. Instead, he contends that there was no finding or evidence that he *used* this special skill in the commission or concealment of his offenses.

This contention is defeated by the facts admitted in Kimber's plea agreement, which include that Kimber understood "that the heating of elemental mercury, including the placing of mercury on or in toasters, and on or around heated food, greatly increases the likelihood that mercury would vaporize into the air and be inhaled." J. App'x at 19. By placing mercury in the AMC cafeteria's toaster and under its heat lamp, Kimber used his special knowledge of chemicals to facilitate his offense because the "special skills increase[d] his chances of succeeding."[2] United States v. Fritzson, 979 F.2d 21, 22 (2d Cir. 1992).

---

[2] Kimber also argues that the district court did not adopt this factual finding. However, the district court applied the special skill enhancement "for the reasons set forth in the [PSR] and in the government's sentencing memorandum." J.

23

"The fact that the same offenses could have been committed by a person without the defendant's special training is immaterial." Id. Thus, the court properly found that Kimber used a special skill in the commission of his offenses.

B.    Vulnerable Victim Adjustment

U.S.S.G. § 3A1.1(b)(1) provides that "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim, [the sentencing court shall] increase [the offense level] by 2 levels."  "Vulnerable victim" is defined in the section's commentary as "a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct."  U.S.S.G. § 3A1.1 cmt. n.2.

Here, the sentencing court applied a vulnerable victim adjustment under § 3A1.1 because AMC had "confirmed that at the time of the mercury attacks there were patients in the impacted areas who were critically ill and not in a position to seek treatment at another hospital or otherwise in a position to protect

App'x at 141.  The government's sentencing memorandum argued, among other things, that the placement of the mercury in the toaster and under the heat lamp reflected the use of Kimber's special skill. Id. at 66.  The district court thus adopted the finding that we conclude was sufficient to support the enhancement.

24

themselves." J. App'x at 142. The Probation Department had not recommended a vulnerable victim adjustment because none of the patients awaiting care, who were "vulnerable individuals" who "could potentially have been victimized," was "impacted or targeted by the offense." PSR ¶ 73. On appeal, Kimber essentially repeats the reasoning of the PSR. He contends that the sentencing court erred in applying the adjustment because no one was poisoned by the mercury, and since there was no harm there was no victim – vulnerable or otherwise.

We have never held that actual infliction of harm is a prerequisite to the application of a vulnerable victim adjustment. The adjustment "reflect[s] the public interest in more severely punishing those whose choice of victim demonstrates an extra measure of criminal depravity." United States v. Hershkowitz, 968 F.2d 1503, 1505 (2d Cir. 1992). That interest is present regardless of whether a defendant who targets a vulnerable victim is ultimately successful; the "choice of victim demonstrates an extra measure of criminal depravity" in either case. Thus, a defendant who deliberately exposes hospital patients to a dangerous chemical may well be subject to a vulnerable victim adjustment even if by sheer luck no patients happen to be harmed.

25

In any event, the record here supports a finding that some patients were indeed harmed. The mercury that Kimber placed by the triage window of AMC's emergency room in his first attack caused hospital officials to shut down the emergency room. At the time of the shutdown, several patients were awaiting emergency care, including an eleven-year-old child suffering from seizures and a seventy-nine-year-old man complaining of abdominal pain. While the record does not indicate that any patient suffered lasting injury from the shutdown, the delay in care necessarily caused some of these patients to endure additional pain and suffering. This constitutes sufficient harm to render the patients "victims" for purposes of the adjustment.

Kimber protests that he did not intend to injure anyone, let alone single out individuals based on their vulnerability. Rather, he asserts, his actions were intended to "disrupt the financial and business operations of the Albany Medical Center." Appellant's Br. at 12. This argument offers Kimber no relief, as the means he chose to attain his ends was to "cause panic" by exposing AMC's staff and visitors to a dangerous chemical. "[A]pplication of the vulnerable victim adjustment [is] authorized where the offense conduct victimized a vulnerable person even though the entity directly targeted by the offense of conviction was a different person." United States v. Firment, 296 F.3d 118, 121 (2d Cir. 2002); see

26

also, United States v. Echevarria, 33 F.3d 175, 180-81 (2d Cir. 1994) (upholding vulnerable victim adjustment where the exploitation of patients was part of scheme to defraud medical insurers). Moreover, the adjustment "does not require that the defendant select the victim because of his or her vulnerability – it is sufficient that he knew or should have known of this quality when deciding to go ahead with the crime." United States v. McCall, 174 F.3d 47, 50 (2d Cir. 1998). Clearly, a defendant who attempts to disrupt the functioning of a hospital emergency room would know or should know that his conduct is likely to harm particularly vulnerable individuals needing immediate care.

Accordingly, the sentencing court did not plainly err in applying the vulnerable victim adjustment despite Kimber's assertion that he did not intend to cause injury and the fact that no one was poisoned by the mercury.

C. Consideration of § 3553(a) Factors and Statement of Reasons Under § 3553(c)

Kimber also argues that his sentence was procedurally unreasonable because the sentencing court failed to adequately consider the factors enumerated in 18 U.S.C. § 3553(a) and failed to adequately explain its imposition of the particular sentence as required by 18 U.S.C. § 3553(c).

The sentencing court stated that it had considered the § 3553(a) factors,

27

"specifically, the defendant's personal history and characteristic[s] as fully set forth in the pre-sentence report." J. App'x at 143. This statement suffices, particularly when combined with the sentencing court's demonstrated familiarity with Kimber's characteristics and the circumstances of the offenses. Absent record evidence suggesting the contrary, we "presume that a sentencing judge has faithfully discharged her duty to consider the statutory factors," United States v. Verkhoglyad, 516 F.3d 122, 129 (2d Cir. 2008) (internal quotation marks omitted), and have "steadfastly refused to require judges to explain or enumerate how such consideration was conducted," United States v. Pereira, 465 F.3d 515, 523 (2d Cir. 2006). The sentencing court's consideration of the § 3553(a) factors therefore was not erroneous, much less plainly erroneous.

Kimber's claim that the sentencing court failed to adequately explain its sentence fares no better. The court stated that it had imposed a sentence at the top of the Guidelines range because the Guidelines did not take into consideration that Kimber had on four occasions "substantially endangered public health and safety, acting in a manner which was deliberate [and] planned." J. App'x at 143. This explanation satisfied § 3553(c)'s "goals of (1) informing the defendant of the reasons for his sentence, (2) permitting meaningful appellate review, (3) enabling the public to learn why the defendant

received a particular sentence, and (4) guiding probation officers and prison officials in developing a program to meet the defendant's needs." United States v. Villafuerte, 502 F.3d 204, 210 (2d Cir. 2007).

It is manifest from the sentencing court's explanation that it was focused primarily on the seriousness of Kimber's conduct, as illustrated by the extreme danger to which he exposed many vulnerable people, his targeting of a hospital, his terroristic motives, and the callous quality of his actions. As the court noted, the Guidelines range would have been the same if Kimber had committed only one of his attacks, and did not take into account that he repeatedly engaged in the same conduct. The court's explanation is fully sufficient to enable us to understand its reasoning and to conclude that the sentence was entirely reasonable and appropriate. Accordingly, we see no error in the court's explanation of its choice of sentence.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.