# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 3, 2022

Lyle W. Cayce
Clerk

No. 21-50945

United States of America,

*Plaintiff—Appellee,*

*versus*

Christopher Charles Perez,

*Defendant—Appellant.*

Appeal from the United States District Court
for the Western District of Texas
No. 5:20-CR-283

Before Smith, Wiener, and Southwick, *Circuit Judges*.
Jerry E. Smith, *Circuit Judge*:

In April 2020, Christopher Perez made two posts on Facebook claiming that he had paid a friend's cousin, who was COVID-19 positive, to lick everything in two San Antonio grocery stores. The posts were false, but he was prosecuted for perpetrating a hoax biological-weapons attack. He was convicted and sentenced to fifteen months' imprisonment.

Perez appeals his conviction, maintaining that the biological-weapons statute does not extend to conduct such as licking items in a grocery store and that the terrorist-hoax statute is an unconstitutional restriction on free

speech. He also points out an undisputed error in his sentencing calculation.

We reject Perez's challenges to his conviction. Although the biological-weapons statute does contain an implied exception for local crimes, Perez's purported conduct was serious enough to place him within the purview of federal law enforcement. And threats like Perez's are not protected by the First Amendment.

We thus affirm the conviction. But because the district court miscalculated his sentence, we vacate it and remand for resentencing.

I.

On April 5, 2020, shortly after COVID-19 lockdowns had been implemented throughout the United States, Perez made the following post on Facebook, referring to two grocery stores in San Antonio:



**Christopher Robbins**
16 mins · 🌐

PSA!! Yo rt HEB MERCADO!!
My homeboys cousin has covid19 and has licked every thing for past 2 days cause we paid him too😂😂😂😂...big difference is we told him not to be these fucking idiots who record and post online...YOU'VE BEEN WARNED!!!
HEB on nogalitos next ;)

He took the post down soon afterwards, apparently in response to a friend's suggestion that the post might expose Perez to criminal liability. But he later made a second post that he left up for at least twenty-three hours:

No. 21-50945



The headline he was responding to read "H-E-B partner tests positive for COVID-19."

Perez had not actually paid anyone to lick anything at H-E-B, but his posts nonetheless set off alarm bells. An unknown member of the public reported the first post to law enforcement. Two FBI agents were dispatched to Perez's house to interview him. Perez admitted making the post but said that he had been "shit talking" and that the statements in the post were false. He apologized for making the post and claimed that he had been motivated by a desire to make people take stay-at-home orders more seriously.

Unmollified, the agents returned to Perez's house the next day with warrants. They searched the residence and arrested Perez. The FBI had also reached out to H-E-B. The company investigated: It tasked four employees with searching thousands of transactions to see whether two individuals identified by the FBI had made a purchase in either store Perez had mentioned. The company considered closing the stores but ultimately decided not to. There is no indication that Perez's posts caused public panic.

Perez was indicted for two violations of 18 U.S.C. § 1038(a)(1), one for each Facebook post. Section 1038(a)(1) criminalizes hoaxes simulating various other crimes. Perez's posts were alleged to simulate violations of

18 U.S.C. § 175, the prohibition on biological weapons. At trial, the government presented testimony to establish the above facts. The jury convicted Perez on both counts.

The presentence investigation report ("PSR") assigned Perez a criminal history category of III, based in part on a 2006 offense that had resulted in a sentence of deferred adjudication. The PSR recommended a sentence of 15–21 months, and Perez made no objections. The court imposed a sentence of 15 months' imprisonment, followed by three years of supervised release. Perez appeals his conviction and sentence.

## II.

Perez's first challenge is a statutory one. He points to *Bond v. United States*, 572 U.S. 844 (2014), which held that 18 U.S.C. § 229, the prohibition on chemical weapons, contains an implied exception for purely local crimes. Perez maintains that the same logic applies to § 175 and that the conduct described in his Facebook posts would have been a purely local crime and thus outside the reach of the statute. We accept Perez's first premise but not his second: Section 175 does include the same local-crime exception as does § 229, but the crime Perez claimed to have committed is nonetheless within the sweep of the statute.

The defendant in *Bond* had used chemicals pilfered from her employer to inflict a mild rash on a romantic rival. *See* 572 U.S. at 852. That conduct appeared to constitute a violation of § 229, which prohibits the possession and use of chemical weapons. But the Supreme Court looked beyond the statutory text: It cited *Gregory v. Ashcroft*, 501 U.S. 452 (1991), for the proposition that "overrid[ing] the usual constitutional balance of federal and state powers" requires a clear statement, *Bond*, 572 U.S. at 858 (citation omitted). Section 229 contained no clear statement that Congress intended the statute to "reach purely local crimes," so the Court held that it did not apply to the

defendant's conduct. *Id.* at 860.

The reasoning of *Bond* suggests that there is an implied "local crimes" exception to § 175 as well. That statute, like § 229, lacks any clear statement implicating purely local crimes. Section 175's prohibitions apply to biological weapons rather than to chemical weapons. But the clear-statement rule articulated in *Gregory* and *Bond* is too general to depend on such a fine distinction. *Bond* states that "the punishment of local criminal activity" is an area of traditional state authority. *Id.* at 858. That is equally true whether the local criminal activity involves biological or chemical agents.

Other courts have reached the same conclusion. The Sixth Circuit was most explicit: It noted that "both § 229 and § 175 originate in the Geneva Protocol of 1925 and both are treaty-implementing statutes." That court thus elected to "follow the Supreme Court's instruction and interpret § 175 in light of federalism principles." *United States v. Levenderis*, 806 F.3d 390, 397 (6th Cir. 2015). The Second and Tenth Circuits have also performed *Bond* analyses in § 175 cases. *See United States v. Le*, 902 F.3d 104, 113–14 (2d Cir. 2018); *United States v. Hale*, 762 F.3d 1214, 1224–26 (10th Cir. 2014). So has the Northern District of California. *See United States v. Chamberlain*, No. 14-cr-316, 2015 U.S. Dist. LEXIS 114686, at *6–8 (N.D. Cal. Aug. 27, 2015).

The government's main response is that chemical agents are far more accessible than are biological agents. We are skeptical. Even if one is not infected with a contagious virus, a biological weapon, defined literally, might be as simple as a knife covered in bacteria. *See* 18 U.S.C. § 178(1) (defining "biological agent"). And even if local crimes involve chemical agents more often than do biological ones, that does not mean that *Bond*'s presumption would not apply to biological attacks. *Bond* stressed that it was a "curious case," but the Court nonetheless applied the presumption it articulated. 572 U.S. at 860. A case involving purely local use of biological weapons might

be even more curious, but that does not mean that the clear-statement rule would not apply. We thus agree with Perez that § 175, like § 229, does not apply to purely local conduct.

But that does not help Perez if, as we also conclude, the crime he claimed to commit was not purely local. *Bond* did not articulate any clear test for whether crimes are local, but it is possible to discern some relevant factors. Among scattered *dicta*, the Court listed "assassination, terrorism, and acts with the potential to cause mass suffering" as crimes that would not be implicitly excluded from federal law. *Bond*, 572 U.S. at 864. Other courts have provided additional guideposts. *Hale* suggests that crimes are not local if they could be referred to as terrorism "in natural parlance." *Hale*, 762 F.3d at 1225 (quoting *Bond*, 572 U.S. at 861). *Le* implies that crimes are less likely to be purely local if they involve the instrumentalities of interstate commerce, including the internet. *See Le*, 902 F.3d at 112. *Levenderis*, 806 F.3d at 397, provides perhaps the most complete standard: "[T]he question is whether the type and intended use of the biological toxin in this case brings defendant's conduct within the common and ordinary meaning of 'biological weapon.'"

It is not necessary to draw any bright lines in this case because Perez's purported conduct was well within the federal purview. Perez made two public posts on the internet. He claimed to have paid someone to spread COVID-19—then widely understood as a dangerous virus—over "every thing" in two grocery stores. The odds that someone would have died from exposure to Perez's friend's cousin's saliva at either H-E-B store would have been low, but not zero. Surface exposure is not impossible, and performing the attack would have required an infected individual to be in the stores and unmasked. Someone might have eaten a licked item without thoroughly washing it. And even if no one directly exposed died, that person could still have gotten sick and passed the disease onto others.

No. 21-50945

Perez points out that COVID-19 has a low death rate and is not easily transmitted through contact with surfaces. He thus suggests that licking items in grocery stores would have produced few casualties. But even if Perez knew that his purported scheme was less dangerous than it might have been, the caselaw does not suggest that the threshold to raise a crime above the local level is high. The defendant in *Hale* sent one person an envelope that he implied contained hantavirus. *Hale*, 762 F.3d at 1219. Hantavirus has a fatality rate of about 50%, and the circumstances made it unlikely that anyone would have opened the envelope, *see id.*, suggesting that that crime would most likely have killed no one. Perez also cites *United States v. Kimber*, 777 F.3d 553, 557 (2d Cir. 2015), in which the defendant actually did spread mercury in a hospital but successfully poisoned no one. Perez concedes that those cases are severe enough not to be purely local, yet his purported conduct was no less serious.

If the act had actually been carried out, it could easily have created an outbreak of COVID-19 that could have been hard to contain. The resulting panic could also have been severe. Thus, Perez used an instrumentality of interstate commerce, he claimed to have used a deadly virus and spread it widely, and his act would have had the potential to cause mass suffering. We need not conclude that any of those factors, taken alone, is either necessary or sufficient; we hold only that, taken together, they elevate Perez's claimed crimes above the purely local level. Perez's purported scheme was not purely local, so it would have been covered by § 175. His statutory challenge fails.

III.

Perez's next challenge is constitutional. He maintains that § 1038(a)(1), which bans hoax violations of § 175, § 229, and several other statutes, violates the First Amendment's guarantee of freedom of speech. He presents both as-applied and facial challenges. In accordance with circuit

No. 21-50945

practice, *see, e.g.*, *Roy v. City of Monroe*, 950 F.3d 245, 251 (5th Cir. 2020), we turn to his as-applied challenge first. But we reject both challenges.

The distinction between as-applied and facial challenges is sometimes hazy. *See Citizens United v. FEC*, 558 U.S. 310, 331 (2010). But for purposes of this case, it is sufficient to observe that success on his as-applied challenge would require Perez to show that the application of § 1038(a)(1) to his Facebook posts impermissibly infringed his right to free speech. *See Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 462 (1978).

We conclude that Perez cannot make that showing because his posts were not protected speech. Since its enactment, "the First Amendment has permitted restrictions upon the content of speech in a few limited areas." *United States v. Stevens*, 559 U.S. 460, 468 (2010) (quotation omitted). One of those areas is true threats[1]—"those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003). "The speaker need not actually intend to carry out the threat." *Id.* at 359–60.

That description closely tracks Perez's conduct. Both Facebook posts evinced an intent to spread COVID-19 at a second grocery store in addition to the one already targeted. Thus, even assuming that true threats must describe future conduct, *cf. United States v. Reynolds*, 381 F.3d 404, 406 (5th

---

[1] Another is "speech presenting some grave and imminent threat the government has the power to prevent," although "a restriction under [that] category is most difficult to sustain." *United States v. Alvarez*, 567 U.S. 709, 717 (2012) (plurality opinion). The Ninth Circuit pointed to that exception to conclude that speech targeted by § 1038(a)(1) is not protected. *See United States v. Keyser*, 704 F.3d 631, 640 (9th Cir. 2012). Even though we ground our analysis in the more developed doctrine of true threats, we do not reject the possibility that Perez's speech was also unprotected for the reasons identified by the Ninth Circuit.

Cir. 2004) (concluding in a different context that threats may refer to past conduct), Perez's posts qualify.

And Perez's expression, though false, was "serious." *Black*, 538 U.S. at 359. Perez insists that he was not merely joking but rather trying to persuade people to observe stay-at-home orders. But whatever his true intention, his conviction under § 1038(a)(1) means a jury found that his posts "may reasonably [have been] believed." That is enough to show that the posts "would have a reasonable tendency to create apprehension that [their] originator will act according to [their] tenor." *United States v. Morales*, 272 F.3d 284, 287 (5th Cir. 2001) (quotation omitted).

Neither is Perez saved by the fact that his posts did not name "a particular individual or group of individuals." *Black*, 538 U.S. at 359. The posts described actions that would have placed employees and potential shoppers at two grocery stores at risk. He did not explicitly refer to those groups of individuals, but the definition of true threats, though narrow, cannot depend on so technical a distinction. True threats are unprotected because they have relatively low value and because restricting them "protect[s] individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992). None of those factors turns on whether a speaker names individuals or merely places them where those individuals are likely to be. Thus, Perez's posts were unprotected true threats, so applying § 1038(a)(1) to him did not violate his right to free speech.

We turn next to Perez's theory that the statute is facially invalid because of its overbreadth.[2] Success on that challenge would require Perez to

---

[2] Perez brings two facial challenges: In addition to his overbreadth challenge, he brings a "typical facial attack," which requires that "no set of circumstances exists under which [the statute] would be valid." *Stevens*, 559 U.S. at 472 (quotation omitted). Because

show that "a substantial number of [§ 1038(a)(1)'s] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Stevens*, 559 U.S. at 473 (quotation omitted). Facial challenges are disfavored, *Roy*, 950 F.3d at 251, and the Supreme Court has "vigorously enforced the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep," *United States v. Williams*, 553 U.S. 285, 292 (2008).

"The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *Id.* at 293. Section 1038(a)(1) makes it illegal to "engage[] in any conduct with intent to convey false or misleading information under circumstances where such information may reasonably be believed and where such information indicates" that a violation of one of several statutes "has taken, is taking, or will take place." The listed statutes include § 175, § 229, and various others, including those prohibiting attacks on nuclear power plants and the use of explosives. Although the "any conduct" language is undeniably broad, the statute's scope is limited by the requirements that the violator act "with intent to convey false or misleading information" and do so "under circumstances where such information may reasonably be believed."

The statute covers much unprotected speech, like the true threats expressed by Perez in this case.[3] And much of the conduct it covers, such as

---

we have already concluded that the statute's application is valid under the circumstances of this case, separate analysis of Perez's first facial challenge would be redundant.

[3] Even insofar as the statute extends to protected speech, it could still be constitutional if it survives appropriate scrutiny. The Supreme Court has not been entirely clear on the degree of scrutiny to which prohibitions on false speech must be subjected. *Compare*, *Alvarez*, 567 U.S. at 724 (plurality opinion) (applying strict scrutiny), *with id.* at 730–31 (Breyer, J., concurring in the judgment) (applying intermediate scrutiny). And once the

No. 21-50945

hoax terrorist attacks, imposes obvious and significant social harms like panic and waste of investigative resources.

Against that plainly legitimate sweep, Perez posits various examples of supposedly protected speech that would also be prohibited, but they are not convincing. For instance, Perez avers that lying about being home sick or inadvertently spreading misinformation about a disease would both be technical violations of § 1038(a)(1). But being sick at home would not violate § 175. We now have construed that statute not to extend to purely local conduct, and so the lie would not violate § 1038(a)(1). As for mistakenly spreading false information, that would not involve the level of intent required by the statute. Perez also worries that mockumentary fiction, such as *The Blair Witch Project*, would run afoul of the statute. But presenting mockumentaries as such would not meet the "circumstances where such information may reasonably be believed" requirement for liability.[4]

Perez thus fails to identify sufficient overbreadth to sustain his facial challenge to § 1038(a)(1). We do not rule out the possibility that some applications might be impermissible, but we reject his position that the statute, either as applied to him or facially, violates the First Amendment.

IV.

Having rejected Perez's challenges to his conviction, we turn to his

---

correct standard is determined, applying it is not always straightforward. *See Willey v. Harris Cnty. Dist. Att'y*, 27 F.4th 1125, 1131 (5th Cir. 2022). But we do not confront those difficulties in this case because we conclude that the statute's applications to protected speech, whether constitutional or not, are not substantial enough in relation to the plainly legitimate sweep to sustain an overbreadth challenge.

[4] *Cf. Alvarez*, 567 U.S. at 722 (plurality opinion) (opining that "[i]t can be assumed" that the Stolen Valor Act would not apply to a theatrical performance, despite the statutory language).

sentence.  Perez failed to object at sentencing, but the government concedes that he has shown plain error.  The court is not obligated to accept a party's concession, *see, e.g.*, *United States v. Gomez Gomez*, 23 F.4th 575, 577 (5th Cir. 2022) (per curiam), but we do so in this case and conclude that Perez's sentence must be vacated.

To prevail on plain-error review, Perez must make three showings: (1) there is an unrelinquished error, (2) the error is clear or obvious, and (3) the error affected his substantial rights.  *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1904–05 (2018).  Even then, he may succeed only if this court determines that the error implicates the fairness, integrity, or reputation of judicial proceedings.  *Ibid.*  That is a difficult showing, but Perez has made it.

In calculating Perez's criminal history, the PSR added two points for a 2007 sentence to six years' deferred adjudication for possession of a controlled substance.  That addition was error.  Per the guidelines, a sentence of less than one year and one month of imprisonment does not count if it was imposed more than ten years before the instant offense.  U.S.S.G. § 4A1.2(e)(2), (k)(2)(C).  Without those two points, Perez's guideline range would have been 12–18 months instead of 15–21.  *See* U.S. Sentencing Comm'n, Guidelines Manual 2021, at 407 (2021).

Although the error was subtle enough that no one noticed it, this court has previously held a substantially identical mistake to be plain error.  *See United States v. Arviso-Mata*, 442 F.3d 382, 385 (5th Cir. 2006).  Perez's sentence, fifteen months, turns out to have been within the correct guideline range.  But "[w]hen a defendant is sentenced under an incorrect Guidelines range—whether or not the defendant's ultimate sentence falls within the correct range—the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error."  *Molina-Martinez v. United States*, 578 U.S. 189, 198 (2016).  There is no reason why

that general rule would not apply to this case.  Perez has shown plain error.

As for the fourth element, a miscalculation of sentencing guidelines that meets the first three elements "will in the ordinary case . . . seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Rosales-Mireles*, 138 S. Ct. at 1903.  This case presents no "countervailing factors" that might make it an exception to that rule.  *Id.* at 1910.  So we will exercise our discretion to correct the error.

The conviction is AFFIRMED, and the sentence is VACATED and REMANDED for resentencing.